1  LISA DARLING-ALDERTON - State Bar No. 221738
   lalderton@wpdslaw.com
2  **WOOLLS PEER DOLLINGER & SCHER**
   A Professional Corporation
3  One Wilshire Building
   624 South Grand Avenue, 22nd Floor
4  Los Angeles, California 90017
   Telephone:   (213) 629-1600
5  Facsimile:    (213) 629-1660

6  Attorneys for Plaintiffs
   EMPLOYERS MUTUAL CASUALTY
7  COMPANY and ILLINOIS EMCASCO
   INSURANCE COMPANY

8
                    **UNITED STATES DISTRICT COURT**
9
                    **EASTERN DISTRICT OF CALIFORNIA**
10

11

12  EMPLOYERS MUTUAL CASUALTY          Case No.:
    COMPANY and ILLINOIS EMCASCO
13  INSURANCE COMPANY,

14            Plaintiff,                **COMPLAINT FOR
                                        DECLARATORY RELIEF**
15  v.

16  NORTH AMERICAN SPECIALTY
    FLOORING, INC.; SPORTS SURFACING,
17  INC.; S. C. ANDERSON, INC.; JOSE ROY
    GARCIA individually and formerly doing
18  business as ROY'S FLOORING; ROY'S
    FLOORING, INC.; KOSTER AMERICAN
19  CORPORATION doing business as
    KOSTER USA, NAVIGATORS
20  INSURANCE COMPANY,

21            Defendants.

22        Comes  now  EMPLOYERS  MUTUAL  CASUALTY  COMPANY  and

23  ILLINOIS EMCASCO INSURANCE COMPANY, and as their complaint against

24  defendants, allege as follows:

25                    **JURISDICTION AND VENUE**

26        1.     This court has original diversity jurisdiction pursuant to 28 U.S.C. § 1332

27  in that this is a civil action between citizens of different states in which the amount in

28  controversy exceeds $75,000, exclusive of interests and costs.

                              1

[COMPLAINT FOR DECLARATORY RELIEF]

Woolls Peer Dollinger & Scher
A Professional Corporation
One Wilshire Building, 624 South Grand Avenue, 22nd Floor
Los Angeles, California 90017

2.     Venue is proper in this District pursuant to 28 U.S.C. §1391, since the insurance policy at issue in this case was issued in this district and the underlying litigation was filed within this district, and, thus, a substantial part of the events or omissions giving rise to the claim occurred here.

3.     The action for declaratory relief is brought pursuant to 28 U.S.C. § 2201(a).

## THE PARTIES

4.     Plaintiff EMPLOYERS MUTUAL CASUALTY COMPANY ("EMC") is a corporation organized and existing under the laws of the State of Iowa, with its principal place of business in Des Moines, Iowa.

5.     Plaintiff ILLINOIS EMCASCO INSURANCE COMPANY ("EMCASCO") is a corporation organized and existing under the laws of the State of Iowa, with its principal place of business in Des Moines, Iowa.

6.     Defendant NORTH AMERICAN SPECIALTY FLOORING, INC. ("Specialty Flooring"), is a corporation organized and existing under the laws of the State of Illinois, with its principal place of business in Woodstock, Illinois.

7.     Defendant SPORTS SURFACING, INC. ("Sports Surfacing"), is a corporation organized and existing under the laws of the State of Illinois, with its principal place of business in Woodstock, Illinois.

8.     Defendant S. C. ANDERSON, INC. ("Anderson"), is a corporation organized and existing under the laws of the State of California, with its principal place of business in Bakersfield, California.

9.     Defendant JOSE ROY GARCIA, individually and formerly doing business as ROY'S FLOORING, is a resident of California, and is or was doing business in Pacoima and/or Van Nuys, California.

10.     Defendant ROY's FLOORING, INC., is a corporation organized an existing under the laws of the State of California, with its principal place of business in Van Nuys, California. Jose Roy Garcia and Roy's Flooring, Inc. are collectively

Woolls Peer Dollinger & Scher
A Professional Corporation
One Wilshire Building, 624 South Grand Avenue, 22nd Floor
Los Angeles, California 90017

2

referred to herein as "Roy's Flooring".

11. Defendant KOSTER AMERICAN CORPORATION doing business as KOSTER USA ("Koster"), is a corporation organized and existing under the laws of the State of Virginia, with its principal place of business in Virginia Beach, Virginia.

12. Defendant NAVIGATORS INSURANCE COMPANY ("Navigators"), is a corporation organized and existing under the laws of the State of New York, with its principal place of business in Stamford, Connecticut.

**GENERAL ALLEGATIONS – INSURANCE POLICIES**

13. EMC issued the following Commercial General Liability ("CGL") policies to Sports Surfacing (collectively referred to as "Sports Surfacing CGL Policies"):

    a. Policy No. 3D4-58-22---09, effective September 9, 2008-2009;

    b. Policy No. 3D4-58-22---10, effective September 9, 2009-2010;

    c. Policy No. 3D4-58-22---11, effective September 9, 2010-2011;

    d. Policy No. 3D4-58-22---12, effective September 9, 2011-2012, and cancelled May 29, 2012.

14. EMC issued the following Commercial Umbrella policies to Sports Surfacing (collectively referred to as "Sports Surfacing Umbrella Policies"):

    a. Policy no. 3J4-58-22---09, effective September 9, 2008-2009;

    b. Policy no. 3J4-58-22---10, effective September 9, 2009-2010;

    c. Policy no. 3J4-58-22---11, effective September 9, 2010-2011;

    d. Policy no. 3J4-58-22---12, effective September 9, 2011-2012, and cancelled May 29, 2012.

15. EMC issued the following CGL policies to Specialty Flooring (collectively referred to "Specialty Flooring CGL Policies"):

    a. Policy no. 3D5-70-86---09, effective May 29, 2008-2009;

    b. Policy no. 3D5-70-86---10, effective May 29, 2009-2010;

    c. Policy no. 3D5-70-86---11, effective May 29, 2010-2011;

Woolls Peer Dollinger & Scher
A Professional Corporation
One Wilshire Building, 624 South Grand Avenue, 22ⁿᵈ Floor
Los Angeles, California 90017

656494.1
656494.1

d.      Policy no. 3D5-70-86---12, effective May 29, 2011-2012.

16.     EMCASCO issued the following Commercial Umbrella policies to Specialty Flooring (collectively referred to as "Specialty Flooring Umbrella Policies"):

a.      Policy no. 3J5-70-86---09, effective May 29, 2008-2009;

b.      Policy no. 3J5-70-86---10, effective May 29, 2009-2010;

c.      Policy no. 3J5-70-86---11, effective May 29, 2010-2011;

d.      Policy no. 3J5-70-86---12, effective May 29, 2011-2012.

17.     The Sports Surfacing CGL Policies and Specialty Flooring CGL Policies were issued on the same coverage form, CG 00 01, as amended by form CG 22 94 10 01 entitled "Exclusion – Damage to Work Performed by Subcontractors On Your Behalf", and state in relevant part as follows:

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations.

**SECTION 1 – COVERAGES**
**COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**
**1.      Insuring Agreement**

a.      We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. . . .

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B**.

4

Woolls Peer Dollinger & Scher
A Professional Corporation
One Wilshire Building, 624 South Grand Avenue, 22nd Floor
Los Angeles, California 90017

656494.1
656494.1

**b.**    This insurance applies to "bodily injury" and "property damage" only if:

  **(1)**    The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

  **(2)**    The "bodily injury" or "property damage" occurs during the policy period; . . . .

**2.**    **Exclusions**

This insurance does not apply to:

. . . .

  **k.**    **Damage To Your Product**

  "Property damage" to "your product" arising out of it or any part of it.

  **l.**    **Damage To Your Work** [as amended by endorsement form CG 22 94 10 01 entitled "Exclusion – Damage to Work Performed by Subcontractors On Your Behalf"]

  "Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

. . . .

**SECTION V – DEFINITIONS**

. . . .

**13.**    "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

. . . .

**16.**    "Products-completed operations hazard":

  **a.**    Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

  **(1)**    Products that are still in your physical possession; or

  **(2)**    Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

    **(a)**    When all of the work called for in your contract has been completed.

    **(b)**    When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

5

Woolls Peer Dollinger & Scher
A Professional Corporation
One Wilshire Building, 624 South Grand Avenue, 22ⁿᵈ Floor
Los Angeles, California 90017

656494.1
656494.1

Woolls Peer Dollinger & Scher
A Professional Corporation
One Wilshire Building, 624 South Grand Avenue, 22nd Floor
Los Angeles, California 90017

**(c)** When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

**b.** Does not include "bodily injury" or "property damage" arising out of:

**(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured.

**(2)** The existence of tools, uninstalled equipment or abandoned or unused materials; or

**(3)** Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products-completed operations are subject to the General Aggregate Limit.

**17.** "Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

. . . .

**21.** "Your product":

**a.** Means:

**(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

**(a)** You;

**(b)** Others trading under your name; or

**(c)** A person or organization whose business or

6

Woolls Peer Dollinger & Scher
A Professional Corporation
One Wilshire Building, 624 South Grand Avenue, 22nd Floor
Los Angeles, California 90017

assets you have acquired; and

**(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

**(2)** The providing of or failure to provide warnings or instructions.

**c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

**22.** "Your work":

**a.** Means:

**(1)** Work or operations performed by you or on your behalf; and

**(2)** Materials, parts or equipment furnished in connection with such work or operations

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

**(2)** The providing of or failure to provide warnings or instructions.

18. The Sports Surfacing CGL Policies and the Specialty Flooring CGL Policies include an additional insured endorsement entitled "Blanket Additional Insured – Construction Contracts including Completed Operations – Vicarious Liability", form CG 7482.3 (1-08), which states in relevant part as follows:

This endorsement modifies the insurance provided under the following:
COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.   SECTION II – WHO IS AN INSURED** is amended to include as an additional insured any person or organization when you have agreed in writing in a contract or agreement that such person or organization be added as an additional insured on your

policy. Such person or organization is an additional insured only with respect to liability for "bodily injury," "property damage" or "personal and advertising injury" caused, in whole, by:

1.     Your acts or omissions; or

2.     The acts or omissions of those acting on your behalf;

in the performance of:

      a.     your ongoing operations for the additional insured; or

      b.     "Your work" for the additional insured and included in the "products - completed operations hazard."

19.     The Sports Surfacing Umbrella Policies and the Specialty Flooring Umbrella Polices were issued on the same policy form, CU 00 01, as amended by form CU 7276 entitled "Commercial Umbrella Amendment of Coverage" and form CU 22 64 12 01 entitled "Exclusion – Damage To Work Performed By Subcontractors On Your Behalf", and provide in relevant part as follows:

**COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

**1.     Insuring Agreement**

    **a.**     We will pay on behalf of the insured the "ultimate net loss" in excess of the "retained limit" because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking damages for such "bodily injury" or "property damage" when the "underlying insurance" does not provide coverage or the limits of any "underlying insurance" have been exhausted. We will have no duty to defend any "suit" that any other insurer has a duty to defend. When we have no duty to defend, we will have the right to defend, or to participate in the defense of, the insured against any other "suit" seeking damages to which this insurance may apply. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. At our discretion, we may investigate any "occurrence" that may involve this insurance and settle any resultant claim or "suit", for which we have the duty to defend.

Woolls Peer Dollinger & Scher
A Professional Corporation
One Wilshire Building, 624 South Grand Avenue, 22ⁿᵈ Floor
Los Angeles, California 90017

8

. . . .

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under **Supplementary Payments - Coverages A** and **B**.

This policy applies to "bodily injury" and "property damage" that is subject to an applicable "retained limit". If the "underlying insurance" shown in the Schedule of "underlying insurance" in this policy is provided at limits below the Minimum Applicable Limits for "underlying insurance" listed on the Schedule of "underlying insurance", this policy does not apply.

. . . .

**2.     Exclusions**

This insurance does not apply to:

. . . .

**n.     Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**o.     Damage To Your Work** [as amended by endorsement form CU 22 64 12 01 entitled "Exclusion – Damage To Work Performed By Subcontractors On Your Behalf"]

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

. . . .

**DEFINITIONS**

**13.**   "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

. . . .

**17.**   "Products-completed operations hazard":

**a.**   Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

**(1)**   Products that are still in your physical possession; or

**(2)**   Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

**(a)**   When all of the work called for in your contract

9

Woolls Peer Dollinger & Scher

A Professional Corporation
One Wilshire Building, 624 South Grand Avenue, 22ⁿᵈ Floor
Los Angeles, California 90017

656494.1
656494.1

has been completed.

    **(b)**    When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

    **(c)**    When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

  **b.**    Does not include "bodily injury" or "property damage" arising out of:

    **(1)**    The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured.

    **(2)**    The existence of tools, uninstalled equipment or abandoned or unused materials; or

    **(3)**    Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products-completed operations are subject to the General Aggregate Limit.

**18.**    "Property damage" means:

  **a.**    Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

  **b.**    Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

**19.**    "Retained Limit" means the available limits of all "underlying insurance" or the "self-insured retention", whichever applies.

. . . .

**23.**    "Ultimate net loss" means the total sum, after reduction for recoveries or salvages collectible, that the insured becomes legally

Woolls Peer Dollinger & Scher
A Professional Corporation
One Wilshire Building, 624 South Grand Avenue, 22ⁿᵈ Floor
Los Angeles, California 90017

obligated to pay as damages by reason of settlements or judgments or any arbitration or other alternate dispute method entered into with our consent or the "underlying insurer's" consent.

24.   "Underlying Insurance" includes:

    **a.**   **a**ny policies of insurance listed in the declarations under the schedule of "underlying insurance"; and

    **b.**   any other insurance available to any insured (whether primary, excess, excess umbrella, umbrella or contingent and irrespective of whether the insured elects to call upon such insurance to respond), but only when such other insurance provides the same type of coverage provided in the policies listed in the Schedule of "underlying insurance".

"Underlying insurance" does not include any policy which was purchased specifically to apply in excess of the limits of liability that apply under this policy.

. . . .

27.   "Your product":

    **a.**   Means:

        **(1)**   Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

            **(a)**   You;

            **(b)**   Others trading under your name; or

            **(c)**   A person or organization whose business or assets you have acquired; and

        **(2)**   Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

    **b.**   Includes:

        **(1)**   Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

        **(2)**   The providing of or failure to provide warnings or instructions.

    **c.**   Does not include vending machines or other property rented to or located for the use of others but not sold.

28.   "Your work":

Woolls Peer Dollinger & Scher
A Professional Corporation
One Wilshire Building, 624 South Grand Avenue, 22nd Floor
Los Angeles, California 90017

11

656494.1
656494.1

a.   Means:

    **(1)**   Work or operations performed by you or on your behalf; and

    **(2)**   Materials, parts or equipment furnished in connection with such work or operations

b.   Includes:

    **(1)**   Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

    **(2)**   The providing of or failure to provide warnings or instructions.

20.   The Sports Surfacing Umbrella Polices and Specialty Flooring Umbrella Policies define insured to include:

**3.**   Any additional insured under any policy of "underlying insurance" will automatically be an insured under this insurance.

If coverage provided to the additional insured is required by contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance required by the contract, less any amounts payable by an "underlying insurance".

Additional insured coverage provided by this insurance will not be broader than coverage provided by the "underlying insurance".

21.   Plaintiffs are informed and believe, and on that basis allege, that Navigators issued the following CGL policies to Roy's Flooring:

Policy No. 04-10011633 from April 1, 2007 to April 1, 2008

Policy No. 04-10043200 from April 14, 2008 to April 14, 2009

Policy No. 04-10083990 from April 14, 2009 to April 14, 2010.

## GENERAL ALLEGATIONS – UNDERLYING ACTION

22.   On November 16, 2017, Anderson filed a lawsuit against "Jose Roy Garcia, an individual formerly doing business as Roy's Flooring, also known as Roy's Flooring, Inc., a California corporation; North American Specialty Flooring, Inc., a foreign corporation, formerly doing business as Sports Surfaces, a business entity of

Woolls Peer Dollinger & Scher

A Professional Corporation
One Wilshire Building, 624 South Grand Avenue, 22ⁿᵈ Floor
Los Angeles, California 90017

656494.1
656494.1

[COMPLAINT FOR DECLARATORY RELIEF]

unknown form but also known as Sports Surfaces Traction USA; and Koster American Corporation doing business as Koster USA, a foreign corporation licensed and registered to do business in California", in Kern County Superior Court, Case No. BCV-17-102683-TSC (hereinafter referred to as "the Underlying Action"). A true and accurate copy of the currently effective pleading filed in the Underlying Action is attached here as Exhibit 1.

23.     The Underlying Action includes causes of action for breach of subcontract against Roy's Flooring; negligence against Roy's Flooring, Specialty Flooring/Sports Surfaces, and Koster; breach of warranty against Roy's Flooring and Koster; breach of implied warranty against Roy's Flooring and Specialty Flooring/Sports Surfaces; and strict liability against Roy's Flooring, Specialty Flooring/Sports Surfaces, and Koster.

24.     In the Underlying Action, Anderson alleges that on or about May 15, 2007, it entered into a contract with California State University Bakersfield for a construction project referred to as the "Student Recreation Center". Anderson further alleges that on or about June 18, 2007, it entered into a subcontract with Roy's Flooring in connection with the Student Recreation Center project whereby Roy's Flooring agreed to:

> Provide all labor, material and equipment necessary to furnish and install wood flooring, rubber flooring and sports flooring complete per 100% Construction Documents dated 3/7/07 (See Exhibit A), Project Manual (Volumes 1 & 2) dated 3/7/07, S.C. Anderson, Inc. Construction Manager's Manual dated 3/6/07, Addendum #1 dated 3/23/07, Addendum #2 dated 4/2/07, and Addendum #3 dated 4/5/07; Scope of Work specifically includes, but is not limited to, all work identified in Bid package #16A (Exhibit B), all of which may hereinafter be referred to as the "Roy's Flooring Scope of Work". Exhibit 1, ¶8.

In addition, Anderson alleges that five "Subcontract/Purchase Order Adjustments" were agreed upon and entered into between Anderson and Roy's Flooring, including

Woolls Peer Dollinger & Scher
A Professional Corporation
One Wilshire Building, 624 South Grand Avenue, 22nd Floor
Los Angeles, California 90017

13

[COMPLAINT FOR DECLARATORY RELIEF]

Change Order #5 (dated July 15, 2009) whereby Roy's Flooring agreed to "Provide all labor, material and equipment necessary to install moisture sealant in fitness room" and "Provide all labor, material and equipment necessary to install moisture sealer at running track." Exhibit 1, ¶9.

25.   In the Underlying Action, Anderson further alleges:

- "[A]s a result of excess moisture present in the concrete slab of the Rec Center Fitness Room Floor, it was decided that a sealant would be required to protect the rubber floor that was to be placed thereon." It is further alleged that "Koster was chosen to supply the sealant; however, Koster refused to provide the sealing product directly to Roy's Flooring since Roy's Flooring was not a 'certified' installer of the Koster product." Exhibit 1, ¶10.

- "Roy's Flooring engaged Sports Surfaces, who had claimed to be 'certified' as an installer of Koster sealer products, to obtain the Koster sealer, which Sports Surfaces did; and, after preparation of the surface of the concrete floor by Sports Surfaces to Koster's satisfaction and specifications, Sports Surfaces applied the Koster sealer under the claimed supervision of the Koster representative. Sports Surfaces then proceeded to prepare and install the Moose Sports Surfacing Ltd. supplied rubber floor in accordance with the plans and specifications for the Rec Center Project." Exhibit 1, ¶ 11.

- In February of 2016, Anderson was informed by the Owner that the "rubber flooring in the fitness room of the Rec Center was failing." Exhibit 1, ¶14.

- In "April 2016, core samples, testing and analysis of the Rec Center Fitness Room Flooring were conducted . . .; on or about June 16, 2016, the results of the First Tests were obtained and shared with the Owner, Plaintiff and the Defendants. The results of the First Tests found and

Woolls Peer Dollinger & Scher

A Professional Corporation
One Wilshire Building, 624 South Grand Avenue, 22ⁿᵈ Floor
Los Angeles, California 90017

14

determined that an insufficient layer of the Koster sealer was applied to the concrete floor of the Rec Center Fitness Room which allowed and caused moisture to permeate through to the floor causing the adhesive to fail to remain bonded to the rubber flooring." Exhibit 1, ¶16.

- On December 15, 2016, "further core samples, testing and analysis were performed on the failed flooring by Plaintiff; after the samples had been obtained, the Owner commenced and then completed the demolition, removal and replacement of the Rec Center's Fitness Room's failed flooring." Exhibit 1, ¶18.

- The Owner back-charged Anderson the amount of $229,345.71 for the cost of testing, removal and replacement of the failed flooring. Exhibit 1, ¶19.

- Anderson demanded that defendants in the Underlying Action reimburse Anderson but they refused to pay the remedial costs incurred by the Owner and back-charged to Anderson in the amount of $229,345.71. Exhibit 1, ¶23.

- The following construction defects and deficiencies are alleged by Anderson to have occurred:

  o The dark blue flooring failed due to water intrusion which caused the acrylic adhesive beneath that flooring to fail to remain bonded as a result of its exposure to water, which caused the following:

    ▪ The lack of a cementitious (absorptive) underlayment layer installed at the time of installation; and

    ▪ Moisture from the substrate concrete penetrated the Koster membrane due to an insufficient and too thin application of the Koster mitigation membrane coating to be an effective moisture mitigation membrane.

  o The light blue flooring (border areas), with the urethane adhesive,

Woolls Peer Dollinger & Scher
A Professional Corporation
One Wilshire Building, 624 South Grand Avenue, 22ⁿᵈ Floor
Los Angeles, California 90017

15

failed where air and water-filled blister had migrated under the flooring from the adjacent dark blue flooring which resulted in torn adhesive beneath the light blue flooring. Exhibit 1, ¶¶31, 41.

- The primary causes of these failures were as follows:
  - The Koster sealer layer was not applied thick enough or continuous enough to perform as an effective moisture mitigation membrane; thus, water and vapor passed through the coating.
  - The acrylic adhesive likely never cured effectively and did not develop initial bond strength because it was placed directly onto the Koster membrane, trapping adhesive moisture, and inhibiting the adhesive from curing. Exhibit 1, ¶¶32, 32 [mis-numbered].

## GENERAL ALLEGATIONS – TENDER AND COVERAGE DENIAL

26.     Sports Surfacing and Specialty Flooring tendered their defense in connection with the Underlying Action to plaintiffs. Plaintiffs declined the tenders based on the application of Exclusions k. and l., among other policy provisions.

27.     Navigators tendered Roy's Flooring's defense in connection with the Underlying Action to plaintiffs as an additional insured under plaintiffs' policies. Plaintiffs declined the tenders based on the language in the additional insured endorsements and exclusions k. and l., among other policy provisions.

## FIRST CAUSE OF ACTION FOR DECLARATORY RELIEF RE DUTY TO DEFEND UNDER SPORTS SURFACING CGL POLICIES

### (By EMC Against All Defendants)

28.     Plaintiffs incorporate by reference paragraphs 1 through 27 as if set forth fully herein.

29.     An actual controversy has arisen and now exists between EMC on the one hand and defendants on the other hand as to EMC's rights and obligations under the Sports Surfacing CGL Policies. EMC is informed and believes and on that basis alleges that defendants contend that the claims asserted in the Underlying Action are

Woolls Peer Dollinger & Scher
A Professional Corporation
One Wilshire Building, 624 South Grand Avenue, 22ⁿᵈ Floor
Los Angeles, California 90017

16

656494.1
656494.1

covered or potentially covered by the Sports Surfacing CGL Policies. EMC contends there is no potential that the claims alleged in the Underlying Action seek damages covered by the Sports Surfacing CGL Policies, and therefore, EMC owes no obligation to defend any insured in the Underlying Action.

30.   EMC requests the court to make and enter binding judicial declarations in accordance with its contentions set forth above. The requested declarations are both necessary and proper at this time in that the interests of judicial economy and substantial justice will be served thereby.

## SECOND CAUSE OF ACTION FOR DECLARATORY RELIEF RE DUTY TO INDEMNIFY UNDER SPORTS SURFACING CGL POLICIES

### (By EMC Against All Defendants)

31.   Plaintiffs incorporate by reference paragraphs 1 through 27 as if set forth fully herein.

32.   An actual controversy has arisen and now exists between EMC on the one hand and defendants on the other hand as to EMC's rights and obligations under the Sports Surfacing CGL Policies. EMC is informed and believes and on that basis alleges that defendants contend that the claims asserted in the Underlying Action are covered or potentially covered by the Sports Surfacing CGL Policies. EMC contends there is no potential that the claims alleged in the Underlying Action seek damages covered by the Sports Surfacing CGL Policies, and therefore, EMC owes no obligation to indemnify any insured in the Underlying Action.

33.   EMC requests the court to make and enter binding judicial declarations in accordance with its contentions set forth above. The requested declarations are both necessary and proper at this time in that the interests of judicial economy and substantial justice will be served thereby.

/ / /

/ / /

/ / /

17

Woolls Peer Dollinger & Scher
A Professional Corporation
One Wilshire Building, 624 South Grand Avenue, 22nd Floor
Los Angeles, California 90017

656494.1
656494.1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Woolls Peer Dollinger & Scher
A Professional Corporation
One Wilshire Building, 624 South Grand Avenue, 22ⁿᵈ Floor
Los Angeles, California 90017

## THIRD CAUSE OF ACTION FOR DECLARATORY RELIEF RE DUTY TO DEFEND UNDER SPECIALTY FLOORING CGL POLICIES

### (By EMC Against All Defendants)

34.    Plaintiffs incorporate by reference paragraphs 1 through 27 as if set forth fully herein.

35.    An actual controversy has arisen and now exists between EMC on the one hand and defendants on the other hand as to EMC's rights and obligations under the Specialty Flooring CGL Policies. EMC is informed and believes and on that basis alleges that defendants contend that the claims asserted in the Underlying Action are covered or potentially covered by the Specialty Flooring CGL Policies. EMC contends there is no potential that the claims alleged in the Underlying Action seek damages covered by the Specialty Flooring CGL Policies, and therefore, EMC owes no obligation to defend any insured in the Underlying Action.

36.    EMC requests the court to make and enter binding judicial declarations in accordance with its contentions set forth above. The requested declarations are both necessary and proper at this time in that the interests of judicial economy and substantial justice will be served thereby.

## FOURTH CAUSE OF ACTION FOR DECLARATORY RELIEF RE DUTY TO INDEMNIFY UNDER SPECIALTY FLOORING CGL POLICIES

### (By EMC Against All Defendants)

37.    Plaintiffs incorporate by reference paragraphs 1 through 27 as if set forth fully herein.

38.    An actual controversy has arisen and now exists between EMC on the one hand and defendants on the other hand as to EMC's rights and obligations under the Specialty Flooring CGL Policies. EMC is informed and believes and on that basis alleges that defendants contend that the claims asserted in the Underlying Action are covered or potentially covered by the Specialty Flooring CGL Policies. EMC contends there is no potential that the claims alleged in the Underlying Action seek

[COMPLAINT FOR DECLARATORY RELIEF]

1   damages covered by the Specialty Flooring CGL Policies, and therefore, EMC owes

2   no obligation to indemnify any insured in the Underlying Action.

3       39.     EMC requests the court to make and enter binding judicial declarations in

4   accordance with its contentions set forth above. The requested declarations are both

5   necessary and proper at this time in that the interests of judicial economy and

6   substantial justice will be served thereby.

7   **FIFTH CAUSE OF ACTION FOR DECLARATORY RELIEF RE DUTY TO**

8   **DEFEND UNDER SPORTS SURFACING UMBRELLA POLICIES**

9   **(By EMC Against All Defendants)**

10      40.     Plaintiffs incorporate by reference paragraphs 1 through 27 as if set forth

11  fully herein.

12      41.     An actual controversy has arisen and now exists between EMC on the

13  one hand and defendants on the other hand as to EMC's rights and obligations under

14  the Sports Surfacing Umbrella Policies. EMC is informed and believes and on that

15  basis alleges that defendants contend that the claims asserted in the Underlying Action

16  are covered or potentially covered by the Sports Surfacing Umbrella Policies. EMC

17  contends there is no potential that the claims alleged in the Underlying Action seek

18  damages covered by the Sports Surfacing Umbrella Policies, and therefore, EMC

19  owes no obligation to defend any insured in the Underlying Action.

20      42.     EMC requests the court to make and enter binding judicial declarations in

21  accordance with its contentions set forth above. The requested declarations are both

22  necessary and proper at this time in that the interests of judicial economy and

23  substantial justice will be served thereby.

24  **SIXTH CAUSE OF ACTION FOR DECLARATORY RELIEF RE DUTY TO**

25  **INDEMNIFY UNDER SPORTS SURFACING UMBRELLA POLICIES**

26  **(By EMC Against All Defendants)**

27      43.     Plaintiffs incorporate by reference paragraphs 1 through 27 as if set forth

28  fully herein.

Woolls Peer Dollinger & Scher
A Professional Corporation
One Wilshire Building, 624 South Grand Avenue, 22nd Floor
Los Angeles, California 90017

656494.1
656494.1

44.     An actual controversy has arisen and now exists between EMC on the one hand and defendants on the other hand as to EMC's rights and obligations under the Sports Surfacing Umbrella Policies. EMC is informed and believes and on that basis alleges that defendants contend that the claims asserted in the Underlying Action are covered or potentially covered by the Sports Surfacing Umbrella Policies. EMC contends there is no potential that the claims alleged in the Underlying Action seek damages covered by the Sports Surfacing Umbrella Policies, and therefore, EMC owes no obligation to indemnify any insured in the Underlying Action.

45.     EMC requests the court to make and enter binding judicial declarations in accordance with its contentions set forth above. The requested declarations are both necessary and proper at this time in that the interests of judicial economy and substantial justice will be served thereby.

## SEVENTH CAUSE OF ACTION FOR DECLARATORY RELIEF RE DUTY TO DEFEND UNDER SPECIALTY FLOORING UMBRELLA POLICIES
### (By EMCASCO Against All Defendants)

46.     Plaintiffs incorporate by reference paragraphs 1 through 27 as if set forth fully herein.

47.     An actual controversy has arisen and now exists between EMCASCO on the one hand and defendants on the other hand as to EMCASCO's rights and obligations under the Specialty Flooring Umbrella Policies. EMCASCA is informed and believes and on that basis alleges that defendants contend that the claims asserted in the Underlying Action are covered or potentially covered by the NASF Umbrella Policies. EMCASCO contends there is no potential that the claims alleged in the Underlying Action seek damages covered by the Specialty Flooring Umbrella Policies, and therefore, EMCASCO owes no obligation to defend any insured in the Underlying Action.

48.     EMCASCO requests the court to make and enter binding judicial declarations in accordance with its contentions set forth above. The requested

Woolls Peer Dollinger & Scher
A Professional Corporation
One Wilshire Building, 624 South Grand Avenue, 22nd Floor
Los Angeles, California 90017

20

[COMPLAINT FOR DECLARATORY RELIEF]

declarations are both necessary and proper at this time in that the interests of judicial economy and substantial justice will be served thereby.

## EIGHTH CAUSE OF ACTION FOR DECLARATORY RELIEF RE DUTY TO INDEMNIFY UNDER SPECIALTY FLOORING UMBRELLA POLICIES

### (By EMCASCO Against All Defendants)

49.     Plaintiffs incorporate by reference paragraphs 1 through 27 as if set forth fully herein.

50.     An actual controversy has arisen and now exists between EMCASCO on the one hand and defendants on the other hand as to EMCASCO's rights and obligations under the Specialty Flooring Umbrella Policies. EMCASCO is informed and believes and on that basis alleges that defendants contend that the claims asserted in the Underlying Action are covered or potentially covered by the NASF Umbrella Policies. EMCASCO contends there is no potential that the claims alleged in the Underlying Action seek damages covered by the Specialty Flooring Umbrella Policies, and therefore, EMCASCO owes no obligation to indemnify any insured in the Underlying Action.

51.     EMCASCO requests the court to make and enter binding judicial declarations in accordance with its contentions set forth above. The requested declarations are both necessary and proper at this time in that the interests of judicial economy and substantial justice will be served thereby.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

1.     On the First Cause of Action, that the Court make and enter binding judicial declarations that EMC owes no obligation to defend any insured in the Underlying Action pursuant to the Sports Surfacing CGL Policies;

2.     On the Second Cause of Action, that the Court make and enter binding judicial declarations that EMC owes no obligation to indemnify any insured in the Underlying Action pursuant to the Sports Surfacing CGL Policies.

21

Woolls Peer Dollinger & Scher
A Professional Corporation
One Wilshire Building, 624 South Grand Avenue, 22nd Floor
Los Angeles, California 90017

[COMPLAINT FOR DECLARATORY RELIEF]

3.      On the Third Cause of Action, that the Court make and enter binding judicial declarations that EMC owes no obligation to defend any insured in the Underlying Action pursuant to the Specialty Flooring CGL Policies;

4.      On the Fourth Cause of Action, that the Court make and enter binding judicial declarations that EMC owes no obligation to indemnify any insured in the Underlying Action pursuant to the Specialty Flooring CGL Policies.

5.      On the Fifth Cause of Action, that the Court make and enter binding judicial declarations that EMC owes no obligation to defend any insured in the Underlying Action pursuant to the Sports Surfacing Umbrella Policies;

6.      On the Sixth Cause of Action, that the Court make and enter binding judicial declarations that EMC owes no obligation to indemnify any insured in the Underlying Action pursuant to the Sports Surfacing Umbrella Policies.

7.      On the Seventh Cause of Action, that the Court make and enter binding judicial declarations that EMCASCO owes no obligation to defend any insured in the Underlying Action pursuant to the Specialty Flooring Umbrella Policies;

8.      On the Eighth Cause of Action, that the Court make and enter binding judicial declarations that EMCASCO owes no obligation to indemnify any insured in the Underlying Action pursuant to the Specialty Flooring Umbrella Policies.

9.      For such other and further relief as the court deems just and proper.

DATED:  April 25, 2019                    WOOLLS PEER DOLLINGER & SCHER
                                          A Professional Corporation


                                          /s/ Lisa Darling-Alderton
                                          LISA DARLING-ALDERTON
                                          Attorneys for Plaintiffs
                                          EMPLOYERS MUTUAL CASUALTY
                                          COMPANY and ILLINOIS EMCASCO
                                          INSURANCE COMPANY

[COMPLAINT FOR DECLARATORY RELIEF]

656494.1
656494.1

# Exhibit 1



# Exhibit 1

232330.1

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
JOSE ROY GARCIA, an Individual formerly doing business as ROY'S
FLOORING, also known as ROY'S FLOORING, INC., a California
corporation; "Additional Parties Attachment form is attached"

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
S.C. ANDERSON, INC., a California corporation,

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*
FILED
SUPERIOR COURT OF CA, COUNTY OF KERN
NOV 1 6 2017
TERRY McNALLY, CLERK
BY_____ DEPUTY
ENDORSED

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*<br>Kern County Superior Court, Metropolitan District, Civil Division<br>1415 Truxtun Avenue, Bakersfield, California 93301 | CASE NUMBER:<br>*(Número del Caso):*<br>BCV-17-102683 TSC |
|---|---|

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*

| DATE: NOV 1 6 2017<br>*(Fecha)* | Terry McNally | Clerk, by<br>*(Secretario)* | V. COFIELD | , Deputy<br>*(Adjunto)* |
|---|---|---|---|---|

For proof of service of this summons, use Proof of Service of Summons *(form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)        ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
   ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

**SUMMONS**
**"AMENDED"**

SUM-200(A)

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| S.C. Anderson, Inc. vs. Jpose Roy Garcia, et al. | BCV-17-102683-TSC |

## INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.):*

☐ Plaintiff   ☑ Defendant   ☐ Cross-Complainant   ☐ Cross-Defendant

NORTH AMERICAN SPECIALTY FLOORING, INC. a foreign corporation, formerly doing business as SPORTS SURFACES, a business entity of unknown form but also known as SPORTS SURFACES TRACTION USA; and KOSTER AMERICAN CORPORATION, doing business as KOSTER USA, a foreign corporation Licensed and registered to do business in California; and DOES 1 through 50; inclusive,

Page _____ of _____

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT —— "AMENDED"**
**Attachment to Summons**

FILED

SUPERIOR COURT OF CA, COUNTY OF KERN

NOV **1 6** 2017

TERRY McNALLY, CLERK

BY: _____ DEPUTY

*ENDORSED*

1  Ray T. Mullen, Esq., CSB #111852

**LAW OFFICE OF RAY T. MULLEN**

2  1405 Commercial Way, Suite 130

Bakersfield, California 93309

3  Tel:        (661) 631-1531

4  Fax:       (661) 631-2427

E-Mail:    Ray@Raymullen.com

5

Attorneys for Plaintiff: S.C. Anderson, Inc.

6

**NOTICE OF ASSIGNMENT AND CASE MANAGEMENT CONFERENCE**

Assigned to ____ THOMAS S. CLARK ____ for all purposes.

Hearing Date: ____ MAY 1 5 2018 ____

Time: ____ 8:15 am ____

Department: ____ 17 ____

**See CRC Rule 3.720 Et. Seq.**

7             **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

8  **COUNTY OF KERN, METROPOLITAN DISTRICT, CIVIL DIVISION [UNLIMITED]**

9  **S.C. ANDERSON, INC.,** a California
corporation,

10                    Plaintiff,

11  vs.

12  **JOSE ROY GARCIA,** an Individual
formerly doing business as **ROY'S**

13  **FLOORING,** also known as **ROY'S
FLOORING, INC.,** a California

14  corporation; **NORTH AMERICAN
SPCIALTY FLOORING, INC.,** a foreign

15  corporation, formerly doing business as
**SPORTS SURFACES,** a business

16  entity of unknown form but also known as
**SPORTS SURFACES TRACTION USA;**

17  and **KOSTER AMERICAN
CORPORATION** doing business as

18  **KOSTER USA,** a foreign corporation
Licensed and registered to do business in

19  California; and **DOES** 1 through 50;
inclusive,

20

21                    Defendants.

22

**CASE NO.: BCV-17-** 102683 TSC

**COMPLAINT FOR:**

1. Breach of Written Subcontract Agreement
2. Negligence
3. Breach of Express Warranties
4. Breach of Implied Warranties
5. Strict Liability

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

22          **COMES  NOW**, Plaintiff S.C. Anderson, Inc., (hereinafter referred to as

23  "Plaintiff"), by and through its attorney of record, and in support of its Complaint, states

24  and alleges as follows:

25

COMPLAINT FOR BREACH OF WRITTEN SUBCONTRACT AGREEMENT; NEGLIGENCE; BREACH OF
EXPRESS WARRANTIES; BREACH OF IMPLIED WARRANTIES; AND STRICT LIABILITY - 1

## VENUE, JURISDICTION AND GENERAL ALLEGATIONS

1.     Plaintiff, is, and at all times herein mentioned has been, a California corporation licensed by the Contractors State License Board of the State of California to do business as a Class "B" General Contractor in the State of California, with its principal place of business located in the City of Bakersfield, County of Kern, State of California.

2.     Plaintiff is informed and believes and based thereon alleges as follows:

a.     That Defendant: Jose Roy Garcia, an individual formerly doing business as Roy's Flooring, also known as Roy's Flooring, Inc., a California corporation, (hereinafter referred to as "Roy's Flooring"),with its principal place of business located in the City of Van Nuys, County of Los Angeles, State of California, is, and at all times relevant hereto was, doing business as a Class "C-15", Flooring and Floor Covering Contractor under California State Contractors License number 637480.

b.     That Defendant: North American Specialty Flooring, Inc., a foreign corporation formerly doing business as Sports Surfaces, a business entity of unknown form also known as Sports Surfaces Traction USA (hereinafter referred to as "Sports Surfaces"), is, and at all times herein mentioned was, a California corporation, with its principal place of business in Woodstock, Illinois.

c..     That Defendant: KOSTER American Corporation, doing business as Koster USA (hereinafter referred to as "Koster"), is, and at all times herein mentioned was, a foreign stock corporation licensed and registered to do business in the State of California as Secretary of State corporation number: C3051066, with its principal place of business in Virginia Beach, Virginia.

3.     The contract form the work of improvement which is the subject of this lawsuit was entered into in the County of Kern and concerns real property and the improvements thereon which are located in the City of Bakersfield, County of Kern, State of California.

4.     Plaintiff is ignorant of the true names and capacities of Defendants sued herein as Does 1 through 50, inclusive, and therefore sues these Defendants by such

fictitious names.  Plaintiff will amend this Complaint to allege their true names and capacities when ascertained.  Plaintiff is informed and believes and on such information and belief alleges that each of the fictitiously named Defendants is responsible in some manner for the occurrences herein alleged and that Plaintiff's damages, as herein alleged, were proximately caused by their conduct.

5.      Plaintiff is informed and believes and based thereon alleges that the Defendants, and each of them, were the agent(s), principal(s), successor(s), officer(s), and employee(s) of each of their co-Defendants, and in doing the things hereinafter alleged, were acting within the course and scope of such agency and employment and with the participation, permission, agreement, acquiescence, knowledge, and consent of their co-Defendants.

6.      On or about May 15. 2007, Plaintiff entered into a written contract for the construction and work of improvement with California State University Bakersfield (hereinafter referred to as the "Owner"), on a project known as the Student Recreation Center, located at 9001 Stockdale Highway, Bakersfield, California, 93311 (hereinafter referred to as the "Rec Center Project").

7.      On or about June 18, 2007, in the course of Plaintiff's performance of its prime contract on the Rec Center Project, Plaintiff entered into a written Subcontract Agreement (hereinafter referred to as the "Subcontract Agreement") with Defendant: Roy's Flooring.  A true and correct copy of said Subcontract Agreement is attached hereto as Exhibit "A" and by this reference is incorporated herein.

8.      While the exact duties and responsibilities of the parties are delineated in the Subcontract Agreement, including the scope of work to be performed by Roy's Flooring, in consideration for the payment by Plaintiff to Roy's Flooring of the agreed upon sum of Four Hundred Fifty-Three Thousand Nine Hundred Dollars and Zero Cents ($453,900.00), subparagraph 1(b) summarizes the work and material to be furnished by Defendant: Roy's Flooring, in pertinent part, as follows: "Provide all labor, material and equipment necessary to furnish and install **wood flooring, rubber flooring and sports flooring** complete per

100% Construction Documents dated 3/7/07 (See Exhibit A), Project Manual (Volumes 1 & 2) dated 3/7/07, S.C. Anderson, Inc. Construction Manager's Manual dated 3/607, Addendum #1 dated 3/23/07, Addendum #2 dated 4/2/07, and Addendum #3 dated 4/5/07; Scope of Work specifically includes, but is not limited to, all work identified in Bid Package #16A (Exhibit B), all of which may hereinafter be referred to as the "Roy's Flooring Scope of Work".

9.      As part of the performance of the agreed upon Roy's Flooring Scope of Work by Defendant: Roy's Flooring, five Subcontract/Purchase Order Adjustments were agreed upon and entered into between Plaintiff and Roy's Flooring (hereinafter referred to as the "Change Orders"); true and correct copies of the five Change Orders are attached hereto as Exhibit "B" and by this reference are incorporated herein. Specifically, the Change Orders were dated and concerned the following:

#1.     December 19, 2007: "Provide all labor, material and equipment necessary to furnish and install synthetic flooring MP Sports (4mm) per Bulletin #006-A dated 11/05/07"; with a net increase to the Subcontract amount of $72,232.00.

#2.     June 11, 2008: "Provide all labor, material and equipment necessary to provide stripping for 3 (ea) badminton courts in gymnasium per Bulleting No. 033-dated 4/14/08; **NO COST IMPACT**" and "Material cost increase to use 3/4" competition pads in lieu of 3/8" specified pads for resilient wood flooring in room #131 (gym) per Bulletin No. 034 dated 4/14/08; **NO COST IMPACT**".

#3.     March 23, 2009: "Backcharge for use of forklift on 1/26/09 and 1/27/09"; with a net decrease in the Subcontract amount of $577.05.

#4.     June 8, 2009: "Provide all labor, material and equipment necessary to apply Visionmatte to tiles that were damaged by others in weight room;" with a net increase to the Subcontract amount of $441.36.

#5.     July 15, 2009: "Provide all labor, material and equipment necessary to install moisture sealant in fitness room;" with a net increase to the Subcontract amount of

$43,327.91; and "Provide all labor, material and equipment necessary to install moisture sealer at running track;" with a net increase to the Subcontract amount of $28,792.00.

10.     Plaintiff is informed and believes and thereon alleges that as a result of excess moisture present in the concrete slab of the Rec Center Fitness Room Floor, it was decided that a sealant would be required to protect the rubber floor that was to be placed thereon. Koster was chosen to supply the sealer; however, Koster refused to provide the sealing product directly to Roy's Flooring since Roy's Flooring was not a "certified" installer of the Koster product.

11.     Plaintiff is further informed and believes and thereon alleges that in order to obtain the Koster sealer product, and as a further part of the performance of the agreed upon Roy's Flooring Scope of Work by Defendant: Roy's Flooring, as adjusted by the above Change Orders, Roy's Flooring engaged Sports Surfaces, who had claimed to be "certified" as an installer of Koster sealer products, to obtain the Koster sealer, which Sports Surfaces did; and, after preparation of the surface of the concrete floor by Sports Surfaces to Koster's satisfaction and specifications, Sports Surfaces applied the Koster sealer under the claimed supervision of the Koster representative.  Sports Surfaces then proceeded to prepare and install the Moose Sports Surfacing Ltd. supplied rubber floor in accordance with the plans and specification for the Rec Center Project.

12.     Plaintiff is further informed and believes and thereon alleges that Koster provided a fifteen (15) year express warranty covering the Koster sealer applied to the Rec Center floor.

13.     On or about August 12, 2009, the Rec Center Project was completed and a Notice of Completion of the Rec Center Project was recorded.

14.     On or about February of 2016, Plaintiff was informed by the Owner that the rubber flooring in the fitness room of the Rec Center was failing.

15.     In response to the foregoing notification from the Owner of the failing flooring, a conference was conducted among the Owner, Plaintiff and representatives of Roy's Flooring, Sports Surfaces, and Koster to discuss the status of the failing flooring, the

best means to remedy the deficiencies, and the need to obtain core samples, testing and analysis to determine the cause of the flooring failure.

16.     On or about April of 2016, core samples, testing and analysis of the Rec Center Fitness Room Flooring were conducted (hereinafter referred to as the "First Tests"); on or about June 16, 2016, the results of the First Tests were obtained and shared with the Owner, Plaintiff and the Defendants.  The results of the First Tests found and determined that an insufficient layer of the Koster sealer was applied to the concrete floor of the Rec Center Fitness Room which allowed and caused moisture to permeate through to the floor causing the adhesive to fail to remain bonded to the rubber flooring.

17.     Despite repeated demands by Plaintiff, and opportunities to remedy the failed floor, no actions by Roy's Flooring, Sports Surfaces, and Koster were ever undertaken.

18.     On or about December 15, 2016, after written notice had been provided to the Defendants, further core samples, testing and analysis were performed on the failed flooring by Plaintiff; after the samples had been obtained, the Owner commenced and then completed the demolition, removal and replacement of the Rec Center's Fitness Room's failed flooring.

19.     The Owner has now back-charged the Plaintiff the amount of $229,345.71, for the cost of the testing, removal and replacement of the failed flooring.

20.     Despite demand therefore by Plaintiff to Roy's Flooring, Sports Surfaces and Koster, no reimbursement for the foregoing amount has been received and there is now due and owing to Plaintiff the sum of $229,345.71.

21.     Commencing on or about February 1, 2016, a period within the time allowed under the *California Code of Civil Procedure*, the Owner became aware of the recently discovered latent defects in the Rec Center Fitness Room's Flooring System, which was part of the Rec Center Project, which had been installed by Defendants: Roy's Flooring and Sports Surfaces, with the product of, and under the supervision of, Defendant: Koster and DOES 1 through 10, inclusive.

COMPLAINT FOR BREACH OF WRITTEN SUBCONTRACT AGREEMENT; NEGLIGENCE; BREACH OF EXPRESS WARRANTIES; BREACH OF IMPLIED WARRANTIES; AND STRICT LIABILITY - 6

22.     As indicated in the foregoing paragraphs, upon discovery of the latent defects and failures in the Rec Center Fitness Room's Flooring System, as herein described, the Owner notified the Plaintiff of those defects and failures and claimed and demanded that the Plaintiff correct the latent defects and reimburse the Owner for any loss of past, present and/or future use and diminution in value of the Rec Center Fitness Room's Flooring System caused by the occurrence of the latent defects and failures.

23.     As also set forth in the foregoing paragraphs, Plaintiff has demanded that Defendants: Roy's Flooring, Sports Surfaces, and Koster and DOES 1 through 10, inclusive (hereinafter sometimes collectively referred to as the "Flooring Defendants") commence remedial action to cure the latent defects and failures and hold the Plaintiff harmless from any damages claimed by the Owner resulting from those defects and failures. Despite these demands the Flooring Defendants, including DOES 1 through 10, inclusive, have refused and continue to refuse to cure those defects and failures, hold the Plaintiff harmless from the claims of the Owner, and to reimburse the Plaintiff for the remedial costs incurred by the Owner and back-charged to Plaintiff.

### FIRST CAUSE OF ACTION
**[Breach of Subcontract Against Defendant: Roy's Flooring and Does 1 through 5]**

24.     Plaintiff realleges paragraphs 1 through 23 of this Complaint and incorporates them herein as though set forth in full herein and throughout.

25.     Pursuant to the above referenced and incorporated Subcontract Agreement, and the agreed upon Change Orders related thereto, Defendants: Roy's Flooring and DOES 1 through 5, inclusive, agreed to furnish and install at their expense and in good workmanship like manner, all such labor, materials, supplies, facilities, and supervision necessary to accomplish the scope of work set forth in the Subcontract Agreement in strict accordance with and as may reasonably be inferred from the written Subcontract Agreement documents, including, but not limited to, the plans, drawings, specifications, project manual, and Prime Contract provisions made applicable thereto, as well as the agreed upon Change Orders related thereto.

26.     Defendants: Roy's Flooring and DOES 1 through 5, inclusive, by signing the Subcontract Agreement, and the agreed upon Change Orders related thereto, acknowledged that they had examined the contract documents prior to the execution of the written Subcontract Agreement and agreed to comply with those contract documents, as well as all applicable laws, licensing regulations and building codes.

27.     Defendants: Roy's Flooring and DOES 1 through 5, inclusive, agreed to do all things as might be necessary to protect the work affected by them and their subcontractors, and the materials supplied and installed by Defendants, or their subcontractors and material persons, and each of them, from any loss or damage thereto by the existing known conditions of the Rec Center Project site and/or by the defective or incomplete labor or materials of others.

28.     In consideration for the above described performance by Defendants: Roy's Flooring and DOES 1 through 5 inclusive, Plaintiff agreed to pay Defendants: Roy's Flooring and DOES 1 through 5, inclusive, for the labor, materials, equipment and other facilities provided or performed by said Defendants pursuant to the written Subcontract Agreement, and the agreed upon Change Orders related thereto.

29.     Plaintiff has fully performed all of Plaintiff's obligations under the Subcontract Agreement, and the agreed upon Change Orders related thereto, including payment in full to Defendants: Roy's Flooring, except for those obligations excused by the acts, omissions, or breach of the Subcontract Agreement, and the agreed upon Change Orders related thereto, by Defendant: Roy's Flooring.

30.     Defendants: Roy's Flooring and DOES 1 through 5, inclusive, have breached the written Subcontract Agreement, and the agreed upon Change Orders related thereto, in that the labor, materials, equipment and other facilities supplied, provided and/or performed by Defendants: Roy's Flooring and DOES 1 through 10, inclusive, were not of good and workmanship quality, failed to conform to the specifications of the written Subcontract Agreement and contract documents, and failed to conform to applicable laws, licensing regulations and building codes. Further, said Defendants failed to protect the work and products installed by them and their subcontractors and the materials provided and/or installed by said

Defendants, or their subcontractors and material persons, and each of them, from loss or damage purportedly caused by the existing known conditions present at the Rec Center Project site and/or by the defective or incomplete labor or materials of Defendants: Roy's Flooring and DOES 1 through 10, inclusive, or others at said Defendants' request, and said Defendants and each of them, further negligently and carelessly prepared, applied, installed, supervised, inspected, approved, and completed their work and negligently and carelessly selected, prepared, applied, and installed the defective Rec Center Fitness Room's Flooring System, all in violation of their Subcontract Agreement, and the agreed upon Change Orders related thereto.

31.   As a result of the breach(es) of the Subcontract Agreement, and the agreed upon Change Orders related thereto, by Defendants: Roy's Flooring and DOES 1 through 5 inclusive, the Flooring System of the Rec Center Fitness Room of the Rec Center Project were, until removed and replaced by the Owner, defective and experienced construction failure and deficiencies, including but not limited to the following:

A.   The dark blue flooring failed due to water intrusion which caused the acrylic adhesive beneath that flooring to fail to remain bonded as a result of its exposure to water, which was caused by the following:

1.   The lack of a cementitious (absorptive) underlayment layer installed at the time of installation; and

2.   Moisture from the substrate concrete penetrated the Koster membrane due to an insufficient and too thin application of the Koster mitigation membrane coating to be an effective moisture mitigation membrane.

B.   The light blue flooring (border areas), with the urethane adhesive, failed where air and water-filled blisters had migrated under that flooring from the adjacent dark blue flooring which resulted in torn adhesive beneath the light blue flooring.

32.   Plaintiff is informed and believes and thereon alleges that the primary causes of the above-described failures were as follows:

A.    The Koster sealer layer was not applied thick enough or continuous enough to perform as an effective moisture mitigation membrane; thus, water and vapor passed through the coating.

B.    The acrylic adhesive likely never cured effectively and did not develop initial bond strength because it was placed directly onto the Koster membrane, trapping adhesive moisture, and inhibiting the adhesive from curing.

33.    As a further result of the above-described breaches of the Subcontract Agreement, and the agreed upon Change Orders related thereto, by Defendants: Roy's Flooring and DOES 1 through 5, inclusive, as well as their failure and refusal to correct the foregoing latent defects and to reimburse the Owner for any lost income or valuation caused by the aforestated defects, the Owner has submitted a claim against the Plaintiff in the sum of $229,345.71.

34.    As a further result of the above-described breaches of the Subcontract Agreement, and the agreed upon Change Orders related thereto, by Defendants: Roy's Flooring and DOES 1 through 5, inclusive, and the Defendants' refusal to remedy and/or correct the latent defects and construction failures, the Plaintiff has incurred and will continue to incur costs and expenses in defending itself against the Owner's claims, including, but not limited to, attorneys' fees, and expert and consultants' fees to inspect, repair and mitigate damages, and will incur litigation fees and costs, as well as potential liability(ies), and will suffer damages arising out of the defective conditions and said Owner's claims, in amounts currently unknown but within the jurisdiction of this Court.  Plaintiff will seek leave from the within Court to allege the amounts of said damages when they have been ascertained or shall offer said amounts according to proof at time of trial.

35.    The Subcontract Agreement provides that in the event that any action concerning the Subcontract Agreement is undertaken, the prevailing party in such action shall be entitled to receive from the other party(ies) all court costs, a reasonable sum for attorney's fees and all other expenses incurred therein and in the preparation thereof.  Plaintiff has been forced to incur such fees and costs.

## SECOND CAUSE OF ACTION
**[Negligence Against Defendants: Roy's Flooring, Sports Surfaces, Koster and Does 1 through 15]**

36.     Plaintiff realleges and incorporates herein by this reference each and every allegation contained in paragraphs 1 through 35, inclusive, of this Complaint, as though fully set forth in full herein and throughout.

37.     The above-described Flooring Defendants: Roy's Flooring, Sports Surfaces, Koster, and DOES 1 through 15, inclusive, as the Subcontractors, material persons, and/or manufacturers, had a duty pursuant to the terms of the Subcontract Agreement and the agreed upon Change Orders related thereto, as well as the agreements by and among themselves, to exercise ordinary care in the furnishing of labor, materials, inspection, approvals, and supervision necessary to: "Provide all labor, material and equipment necessary to furnish and install **wood flooring, rubber flooring and sports flooring** complete per 100% Construction Documents dated 3/7/07 (See Exhibit A), Project Manual (Volumes 1 & 2) dated 3/7/07, S.C. Anderson, Inc. Construction Manager's Manual dated 3/607, Addendum #1 dated 3/23/07, Addendum #2 dated 4/2/07, and Addendum #3 dated 4/5/07; Scope of Work specifically includes, but is not limited to, all work identified in Bid Package #16A (Exhibit B), all of which may hereinafter be referred to as the "Roy's Flooring Scope of Work", all of which was further supplemented by the agreed upon Change Orders; with said scope of work to be performed in a good and workmanlike manner pursuant to accepted trade standards, and pursuant to the Rec Center Project's plans, specifications, Project Manual, and contract documents as set forth in the Subcontract Agreement, in order to avoid reasonably foreseeable injury to the Owners and users of the Rec Center Fitness Room Flooring.

38.     Plaintiff is informed and believes and thereon alleges that during the course of the construction of the Roy's Flooring Scope of Work, the labor, materials, supervision and other facilities supplied, provided and/or performed by the Flooring Defendants: Roy's Flooring, Sports Surfaces, Koster, and DOES 1 through 15, inclusive, were not of good and workmanship quality, failed to conform to the specifications of the written Subcontract

Agreement, agreed upon Change Orders, and contract documents, and failed to conform to applicable laws, licensing regulations and building codes, all of which was caused by the Defendants' negligent, careless, tortious, and wrongful failure to use reasonable care in the preparation, application, installation, construction, and completion of the Flooring System of the Fitness Room of the Rec Center Project.

39.     Plaintiff is further informed and believes and thereon alleges that the services and materials provided by the Flooring Defendants: Roy's Flooring, Sports Surfaces, Koster, and DOES 1 through 15, inclusive, were not of good and workmanship quality, failed to perform as agreed and intended, failed to conform to the specifications of the written Subcontract Agreement and contract documents, and failed to conform to applicable laws, licensing regulations and building codes. Further, said Defendants failed to protect the work and products installed by them and their subcontractors and the materials provided and/or installed by said Defendants, or their subcontractors and material persons, and each of them, from loss or damage purportedly caused by the known conditions present at the Rec Center Project site and/or by the defective or incomplete labor or materials provided by said Flooring Defendants: Roy's Flooring, Sports Surfaces, Koster, and DOES 1 through 15, inclusive, or  others at said Defendants' request, and said Defendants and each of them, further negligently and carelessly prepared, applied, installed, supervised, inspected, approved, and completed their work and negligently and carelessly selected, prepared, applied, and installed the defective Rec Center Fitness Room's Flooring System.

40.     In doing, or not doing, the acts and omissions described herein, the Flooring Defendants and each of them knew or should have known that if the components of the subject flooring system of the Fitness Room of the Rec Center Project was not properly or adequately prepared, applied, installed, supervised and/or constructed, that the Owner and its users, as well as this Plaintiff, would be substantially damaged thereby.

41.     As a result of the above-described negligence, carelessness, and/or omissions of the Flooring Defendants: Roy's Flooring, Sports Surfaces, Koster and DOES 1 through 15, inclusive, the Flooring System of the Rec Center Fitness Room of the Rec Center Project

were, until removed and replaced by the Owner, defective and experienced construction failure and deficiencies, including but not limited to the following:

A.    The dark blue flooring failed due to water intrusion which caused the acrylic adhesive beneath that flooring to fail to remain bonded as a result of its exposure to water, which was caused by the following:

1.    The lack of a cementitious (absorptive) underlayment layer installed at the time of installation; and

2.    Moisture from the substrate concrete penetrated the Koster membrane due to an insufficient and too thin application of the Koster mitigation membrane coating to be an effective moisture mitigation membrane.

B.    The light blue flooring (border areas), with the urethane adhesive, failed where air and water-filled blisters had migrated under that flooring from the adjacent dark blue flooring which resulted in torn adhesive beneath the light blue flooring.

32.    Plaintiff is informed and believes and thereon alleges that the primary causes of the above-described failures were as follows:

A.    The Koster sealer layer was not applied thick enough or continuous enough to perform as an effective moisture mitigation membrane; thus, water and vapor passed through the coating.

B.    The acrylic adhesive likely never cured effectively and did not develop initial bond strength because it was placed directly onto the Koster membrane, trapping adhesive moisture, and inhibiting the adhesive from curing.

42.    As a further result of the above-described Negligence of the Flooring Defendants: Roy's Flooring, Sports Surfaces, Koster and DOES 1 through 15, inclusive, the Owner has submitted a claim against the Plaintiff to correct the foregoing defects and to reimburse the Owner for any lost income or valuation caused by the aforestated defects.

43.    As a further result of the above-described Negligence of the Flooring Defendants: Roy's Flooring, Sports Surfaces, Koster and DOES 1 through 15, inclusive, and said Defendants' refusal to remedy and/or correct the latent defects and construction

1    failures, Plaintiff has incurred, and will continue to incur, costs and expenses in defending itself

2    against the Owner's claims, including, but not limited to, attorneys' fees, and expert and

3    consultants' fees to inspect, repair and mitigate damages, and will incur litigation fees and

4    costs, as well as potential liability(ies), and will suffer damages arising out of the defective

5    conditions and said Owner's claims, in amounts currently unknown but within the jurisdiction

6    of this Court.  Plaintiff will seek leave from the within Court to allege the amounts of said

7    damages when they have been ascertained or shall offer said amounts according to proof at
     time of trial.

8

9                                        **THIRD CAUSE OF ACTION**
                    **[Breach of Express Warranty Against Defendants: Roy's Flooring, Koster and Does16-20]**

10           44.     Plaintiff realleges and incorporates herein by this reference each and every

11   allegation contained in paragraphs 1 through 43, inclusive, of this Complaint, as though
     fully set forth in full herein and throughout.

12

13           45.     Pursuant to Section 4 of the Subcontract Agreement, Defendant; Roy's

14   Flooring expressly warranted all material and workmanship supplied and performed under

15   that Subcontract Agreement and agreed to promptly amend and make good any defective

16   materials and workmanship to the entire approval and acceptance of the Owner for such
     longer period as the Contractor, the Plaintiff herein, may be required to provide the Owner

17   pursuant to the terms of the Prime Contract.  Plaintiff has been so required to correct the
     recently discovered defects.

18

19           46.     Additionally, as set forth in the above-incorporated paragraphs, Plaintiff is

20   informed and believes and thereon alleges that the Defendant: Koster provided a fifteen (15)
     year Express Warranty for its provided sealant products.

21

22           47.     Defendants: Roy's Flooring, Koster and DOES 16 through 20, inclusive, have

23   breached the above described express warranties by the above-incorporated actions and

24   their inaction by failing to correct and/or remedy the latent defects and failures upon their
     discovery despite being given the opportunity to do so after demand by Plaintiff.

25

48.     As a proximate result of the above-described breaches of the express warranties by Defendants: Roy's Flooring, Koster and DOES 16 through 20, inclusive, including said Defendants' refusal to remedy and/or correct the defects and construction failures, the Owner has submitted a claim against the Plaintiff to reimburse the Owner for the costs and expenses incurred by the Owner to correct the foregoing defects and to reimburse the Owner for any lost income or valuation caused by the aforestated defects.

49.     As a further result of the above-described breaches of the express warranties by Defendants: Roy's Flooring, Koster and DOES 16 through 20, inclusive, and said Defendants' refusal to remedy and/or correct the latent defects and construction failures, Plaintiff has incurred, and will continue to incur, costs and expenses in defending itself against the Owner's claims, including, but not limited to, attorneys' fees, and expert and consultants' fees to inspect, repair and mitigate damages, and will incur litigation fees and costs, as well as potential liability(ies), and will suffer damages arising out of the defective conditions and said Owner's claims, in amounts currently unknown but within the jurisdiction of this Court. Plaintiff will seek leave from the within Court to allege the amounts of said damages when they have been ascertained or shall offer said amounts according to proof at time of trial.

50.     The Subcontract Agreement wherein the express warranty of Defendant: Roy's Flooring is contained, provides that in the event that any action concerning the Subcontract Agreement, the prevailing party in such action shall be entitled to receive all court costs, a reasonable sum for attorney's fees and all other expenses incurred therein and in the preparation thereof.  Plaintiff has been forced to incur such fees and costs.

## FOURTH CAUSE OF ACTION
[Breach of Implied Warranty Against Defendants: Roy's Flooring Sports Surfaces, and Does 1-15]

51.     Plaintiff realleges and incorporates herein by this reference each and every allegation contained in paragraphs 1 through 43, inclusive, of this Complaint, as though fully set forth in full herein and throughout.

52.     Plaintiff is informed and believes and thereon alleges that Defendants: Roy's Flooring and Sports Surfaces and DOES 1 through 15, inclusive, in entering the written

Subcontract Agreement and the agreed upon Change Orders related thereto, as well as the agreements by and among themselves, as set forth in the above-incorporated paragraphs, and in doing, or not doing, the things alleged above, impliedly warranted that the various materials, products, services, membranes, flooring systems and other facilities prepared, applied, assembled, installed, supervised and/or constructed by said Defendants and each of them would be reasonably fit for the purposes intended, and impliedly warranted that the services, construction work and installation of the Rec Center Project's Fitness Room's flooring system would be done in a good and workmanlike manner.

53.    Plaintiff relied upon said implied warranties and believed that the various materials, products, services, membranes, flooring systems and other facilities prepared, applied, assembled, installed, supervised and/or constructed by said Defendants and each of them would be and were reasonably fit for the purposes intended, and that the services, construction work and installation of said flooring system would be done in a good and workmanlike manner.

54.    Defendants: Roy's Flooring and Sports Surfaces, and each of them, breached their implied warranties by the above-incorporated actions and their inaction by failing to correct and/or remedy the defects and failures upon their discovery despite being given the opportunity to do so after demand by Plaintiff.

55.    As a proximate result of the above-described breaches of the implied warranties by Defendants: Roy's Flooring and Sports Surfaces and DOES 1 through 15, inclusive, and said Defendants' refusal to remedy and/or correct the latent defects and construction failures, the Owner has submitted a claim against the Plaintiff for reimbursement for the costs and expenses incurred by the Owner to correct the foregoing defects and to compensate the Owner for any lost income or valuation caused by the aforestated defects.

56.    As a further result of the above-described breaches of the implied warranties by Defendants: Roy's Flooring and Sports Surfaces and DOES 1 through 15, inclusive, and said Defendants' refusal to remedy and/or correct the latent defects and construction failures, Plaintiff has incurred, and will continue to incur, costs and expenses in defending itself

against the Owner's claims, including, but not limited to, attorneys' fees, and expert and consultants' fees to inspect, repair and mitigate damages, and will incur litigation fees and costs, as well as potential liability(ies), and will suffer damages arising out of the defective conditions and said Owner's claims, in amounts currently unknown but within the jurisdiction of this Court. Plaintiff will seek leave from the within Court to allege the amounts of said damages when they have been ascertained or shall offer said amounts according to proof at time of trial.

## FIFTH CAUSE OF ACTION
### [Strict Liability Against Defendants: Roy's Flooring, Sports Surfaces, Koster and Does 1-15]

57.     Plaintiff realleges and incorporates herein by this reference each and every allegation contained in paragraphs 1 through 43, inclusive, of this Complaint, as though fully set forth in full herein and throughout.

58.     The Flooring Defendants: Roy's Flooring, Sports Surfaces, Koster and DOES 1 through 15, inclusive, and each of them, were subcontractors, suppliers, distributors, manufacturers, and/or installers of one or more products or materials that were incorporated as component parts in the flooring system of the Fitness Room of the Rec Center Project.

59.     Said Flooring Defendants, and each of them, knew that they were supplying and installing their defective products and material which were incorporated into the Rec Center Project.

60.     Defendants, and each of them, knew or had reason to know that the Plaintiff and the Owner would rely on the judgment, skill, and expertise of the Flooring Defendants, and each of them, in manufacturing, preparing, applying, inspecting, installing, and completing the flooring system for the Fitness Room of the Rec Center Project, and the related actions and materials provided to effectively provide a moisture barrier and membrane to protect the flooring system from deterioration and degradation, so that the flooring would be reasonably fit for their intended purposes and free of defects.

61.     As indicated and alleged in the above-incorporated paragraphs, the flooring system for the Fitness Room of the Rec Center Project, were defective and failing which

resulted in their removal and replacement by the Owner further resulting in claims by the Owner against the Plaintiff. The Flooring Defendants, and each of them, have refused to correct and/or remedy the admittedly known defects and failures or to remove and replace the flooring system to the proper condition and have since continued to refuse to reimburse Plaintiff for the costs claimed by the Owner against Plaintiff for the costs and expenses incurred in the removal and replacement of the defective flooring system.

62.     As a proximate result of the above-described latent defects and failures and said Flooring Defendants' refusal to remedy and/or correct the defects and construction failures, and their continuing refusal to reimburse Plaintiff for the costs claimed by the Owner against Plaintiff for the costs and expenses incurred in the removal and replacement of the defective flooring system, the Owner has submitted a claim against the Plaintiff for said costs and expenses incurred by Owner to correct the foregoing defects and to reimburse the Owner for any lost income or valuation caused by the aforestated defects.

63.     As a further result of the above-described latent defects and failures caused by the Flooring Defendants, and each of them, including said Defendants' refusal to remedy and/or correct the defects and construction failures, Plaintiff has incurred, and will continue to incur, costs and expenses in defending itself against the Owner's claims, including, but not limited to, attorneys' fees, and expert and consultants' fees to inspect, repair and mitigate damages, and will incur litigation fees and costs, as well as potential liability(ies), and will suffer damages arising out of the defective conditions and said Owner's claims, in amounts currently unknown but within the jurisdiction of this Court. Plaintiff will seek leave from the within Court to allege the amounts of said damages when they have been ascertained or shall offer said amounts according to proof at time of trial.

64.     Based upon the foregoing, the doctrine of strict liability is applicable to the within situation.

**WHEREFORE**, Plaintiff prays judgment against the Defendants and each of them as follows:

## ALL CAUSES OF ACTION

1. For an award of compensatory damages in the sum of $229,345.71, or such other amount according to proof.

2. For an award of consequential, incidental and/or other appropriate damages in amounts according to proof.

3. For an award of costs of suit herein incurred.

4. For such other and further damages and relief as the Court may deem proper.

## FIRST AND THIRD CAUSES OF ACTION

5. For an award of reasonable attorneys' fees according to proof.

## FIFTH CAUSE OF ACTION

6. For an award of damages for the defective products under the doctrine of strict liability in an amount according to proof.

Dated: 11/16/2017        **LAW OFFICE OF RAY T. MULLEN**

By: _____
Ray T. Mullen, Attorney for Plaintiff:
S.C. Anderson, Inc.



# S.C. ANDERSON INC.

P. O. Box 81747 • Bakersfield, CA  93380-1747 • (661) 392-7000 • FAX (661) 391-9999
2160 Mars Court  Bakersfield, CA  93308

## SUBCONTRACT AGREEMENT

PROJECT NO. : _____17005_____

PROJECT NAME: _California State University Bakersfield Student Recreation Center_

THIS AGREEMENT, hereinafter referred to as "Subcontract", entered into this 18th day of June, 2007, between S.C. ANDERSON, INC., hereinafter referred to as "Contractor", whose address is P.O. Box 81747, Bakersfield, California 93380-1747, and  Roy's Flooring, hereinafter referred to as "Subcontractor", whose address is:   10781 Telfair Avenue, Pacoima, California 91331.

WITNESSETH: In consideration of the sums herein agreed to be paid and the terms, conditions and covenants to be by the parties kept and performed, it is agreed as follows:

## 1 . THE WORK

(a) Subcontractor agrees to furnish all material, labor, tools, equipment, appliances, permits, certificates and instruction, and parts manuals therefor to do and complete, in a workmanlike manner and as directed by and to the satisfaction of Contractor, all work hereinafter described for that certain Student Recreation Center to be erected for California State University Bakersfield, hereinafter referred to as "Owner", to be located at 9001 Stockdale Highway, Bakersfield, California  93311, hereinafter referred to as "jobsite", all in accordance with the plans, general conditions, special conditions, drawings and specifications, and addenda prepared therefor by Sink Combs Dethlefs, hereinafter referred to as "Architect". The plans, specifications, drawings, general conditions, special conditions, addenda, and general contract, all of which form a part of the contract between Owner and Contractor dated  May 15, 2007, hereinafter collectively referred to as the "Prime Contract", and which are hereby made a part of this Subcontract (which together with this Subcontract are hereinafter sometimes referred to as the "contract documents") are all available for examination by the Subcontractor at all reasonable times at the office of Contractor. The Subcontractor represents and agrees that it has: carefully examined and understands this Subcontract and the other contract documents, has investigated the nature, locality and site of the work and the conditions and difficulties under which it is to be performed, and that it enters into this Subcontract on the basis of its own examination, investigation, and evaluation of all such matters and not in reliance upon any opinions or representations of Contractor, or of the Owner, or of any of their respective officers, agents, servants, or employees. Subcontractor shall not contract with any other person or entity, except employees, for the performance of Subcontractor's work hereunder without the prior written consent of Contractor.

(b) The materials to be furnished and the work to be performed by Subcontractor are:   Provide all labor, material and equipment necessary to furnish and install  wood flooring, rubber flooring and sports flooring,

complete per 100% Construction Documents dated 3/7/07 (see Exhibit A), Project Manual (Volumes 1 & 2) dated 3/7/07, S.C. Anderson, Inc. Construction Manager's Manual dated 3/6/07, Addendum #1 dated 3/23/07, Addendum #2 dated 4/2/07, and Addendum #3 dated 4/5/07.

Scope of work specifically includes, but is not limited to, all work identified in Bid Package #16A (Exhibit B).

Subcontractor to diligently pursue the work to allow for overall completion of each phase and total contract in accordance with Contractor's C.P.M. schedule, which is available upon request.  Subcontractor is responsible for all his own cleanup and haul off, protection of all surfaces and finishes and multiple move-ons as required to complete work.

Scope of work includes the above, as well as all work that could reasonably be implied from the entire plans and specifications which would customarily be performed or furnished by a Subcontractor performing the aforementioned work.

(c) With respect to the work to be performed and furnished by the Subcontractor hereunder, the Subcontractor agrees to be bound to the Contractor by each and all of the terms and provisions of the Prime Contract including liquidated damages, if any, and to assume toward the Contractor all of the duties, obligations and responsibilities that Contractor, by the Prime Contract, assumes toward the Owner, and that Contractor shall have the same rights and remedies against the Subcontractor as the Owner, under the terms and provisions of the Prime Contract, has against Contractor with the same force and effect as though every such duty, obligation, responsibility, right or remedy were set forth herein in full. The terms and provisions of the Subcontract are intended to and shall be in addition to and not in substitution for any of the terms and provisions of the Prime Contract.

## 2. PRICE

(a)    Contractor agrees to pay Subcontractor for this work (including all taxes levied against such work or borne by Subcontractor as a result thereof) the sum of:
**************************Four Hundred Fifty Three Thousand Nine Hundred Dollars and 00/100******************($453,900.00)******************* hereinafter referred to as "Subcontract price", subject to additions and deductions for changes as may be agreed upon, provided that no payments are to be made unless Subcontractor's rate of progress, work done and material furnished are as herein agreed upon. Payment shall be made as follows:

(i) Invoices submitted to and approved by the Contractor by the 30th of the month shall be paid, less ten percent (10%) retention, after forty nine (49) calendar days upon receipt of billing by Owner.  (All such invoices must be dated and signed by Subcontractor and shall clearly identify the work done by Subcontractor including a designation of the project number, as noted on Page 1 of this Subcontract, and a statement as to the percentage of completion of each subcontract component, if any, as set forth in paragraph 1 (b) hereinabove. See paragraph 2 (b) for contingency payment provisions.)

(ii) Final payment shall be due upon the completion of the work subject to Owner's and Contractor's approval and a complete written release of all liens. (Subcontractor shall not submit any such releases prior to Contractor's request therefor.) Final payment to be made upon the satisfaction of the foregoing conditions and any other conditions provided in this Subcontract.

(b) All payments, including final payment, are subject to the condition precedent that Contractor shall receive from Owner payments in at least the amounts payable to Subcontractor on account of work done by the Subcontractor under this Subcontract, and the time when such payments shall be due and payable to the Subcontractor shall be postponed until ten (10) days after Contractor has received same from the Owner.

(c) The Contractor may, as a condition precedent to making any payment to a Subcontractor, require the Subcontractor to submit lien releases from laborers, employees, unions, suppliers, or from any person, corporation or entity, supplying labor, equipment, supplies or materials to the project. If, at

Subcontract Agreement * Job #17005 – California State University Bakersfield Student Recreation Center

any time during the construction of this project, there shall be filed claims, liens or stop notices against the work required to be performed under the terms of this Subcontract, the Contractor shall have the right to withhold from any payment due or to become due, including progress payments, a sum sufficient to satisfy said claims and liens until such time as the Subcontractor causes said liens or claims to be removed.

## 3. PERFORMANCE

(a) Subcontractor shall prepare and submit to Contractor such shop drawings, samples, specimens, and other data as may be necessary to describe completely the details and construction of the work.  Approval of such shop drawings, samples, specimens or other data by Contractor and/or the Architect shall not relieve Subcontractor of its obligation to perform the work in strict accordance with the plans, specifications, additional provisions hereof, and the other contract documents not its responsibility or for the proper matching and fitting of the work with contiguous work. Subcontractor shall make the initial submission of all such shop drawings, samples, specimens or other data to Contractor forty-five (45) days from the date of the execution of this Subcontract or such earlier time as is provided in the Prime Contract. All proposed substitutions of materials specified in the contract documents and all claims that another material is equal to, and may be used in place of, a material specified in the contract documents must be submitted to the Contractor, or the Contractor's designee, within forty-five (45) days from the date of this Subcontract or at such earlier time as provided in the Prime Contract, with a substitution warranty signed by Subcontractor.

(b) Subcontractor agrees that within seven (7) days of request from Contractor, Subcontractor will provide Contractor with a cost breakdown which itemizes the Subcontractor's bid on the work to be performed under this Subcontract.  Subcontractor agrees to proceed with said work promptly upon notification by Contractor to do so and at all times to prosecute its work continuously with all reasonable speed in such manner as not to delay the progress of any other work and to complete the entire work covered by this Subcontract. Subcontractor agrees to cooperate with Contractor and other subcontractors to the end that several works to be performed by Contractor, Subcontractor and other subcontractors may proceed concurrently, in accordance with the Construction Schedule including revisions.

(c) Subcontractor warrants and presents for the benefit of Contractor and Owner that Subcontractor possesses valid and current contractor's licenses covering all the work to be performed hereunder.  Subcontractor certifies that it has the necessary material under its control to be delivered to the job when required and a sufficient crew of qualified workers to execute this Subcontract properly, without delay, when required by Contractor, in accordance with the Construction Schedule including revisions.

(d) Any obvious uncertainty or inconsistency in the plans or specifications shall be brought to the attention of the Contractor prior to proceeding with Subcontractor's work thereon and such uncertainty or inconsistency shall be resolved and performed as directed by Contractor. . Non performance by reason of alleged defective work by other subcontractors, trades or crafts will not be recognized unless brought to the attention of the Contractor prior to commencement of Subcontractor's work.

(e) Subcontractor agrees to consolidate his debris daily at a place designated by Contractor and to remove his debris from the jobsite immediately after completion of each phase of his work or as required by Contractor. Because Subcontractor's failure to timely consolidate and/or remove his debris creates a hazard and impedes the efficiency of other crafts, it is agreed that Contractor shall have the right, but not the obligation, to do Subcontractor's cleanup work at cost and in such event Subcontractor agrees to immediately pay such cost to Contractor.

(f) Subcontractor agrees that Contractor's equipment will be available to Subcontractor only at the Contractor's discretion for such term and at such rental as shall be mutually agreeable. Subcontractor will use such equipment only for the purposes of performing Subcontractor's work under the Subcontract.  By acceptance of the equipment, Subcontractor agrees that said equipment is in satisfactory condition for the performance of Subcontractor's work.  During the time said equipment is in Subcontractor's possession or under Subcontractor's control, Subcontractor shall, at Subcontractor's expense, keep the equipment in good working order and condition, and shall bear the sole responsibility for all loss or damage to the equipment occasioned by fire, theft, accident, neglect or abuse. This Paragraph 3 shall not operate to otherwise extinguish any liability of Subcontractor to Contractor under this Subcontract.  All liabilities of every kind and nature resulting from the use of said equipment (including Subcontractor's use of such equipment while being operated by an employee of Contractor or a third party) shall be borne by Subcontractor.  Subcontractor shall keep said equipment free from all liens and claims by third parties.  Contractor shall not at any time be responsible for loss of or damage to materials, tools, equipment, appliances or other personal property owned, rented or used by the Subcontractor or of anyone employed by it in the performance of the Work, however caused.

(g) Time is of the essence with respect to this Subcontract, and the Subcontractor shall complete the several portions and the whole of the work at or before the time or times specified in the Prime Contract and in accord with the directions of Contractor and the Construction Schedule, including any additions, deletions or alterations thereto.  Subcontractor agrees to notify contractor within 5 days of any delay that impacts  their scope of work, including associated costs and/or damages.  Failure to notify the contractor of said delay within 5 days of the occurrence relieves the owner and/or contractor of any responsibility of the delay and all associated costs.

## 4. WARRANTY

Subcontractor hereby warrants all material and workmanship provided under this Subcontract for a period of one (1) year from the date of acceptance of the project as a whole by the Owner, or for such longer period and to the full extent as may be required of Contractor by the terms of the Prime Contract. Subcontractor shall promptly amend and make good any defective materials or workmanship to the entire approval and acceptance of the Owner, the Architect and the Contractor. If Subcontractor refuses or neglects to proceed at once with the correction of the defective or rejected material or the workmanship, after receiving notice to do so, Contractor shall have the right and power to have the defects remedied or changes made at the expense of the Subcontractor, and Subcontractor agrees to pay immediately the cost thereof to Contractor.

## 5. TIME EXTENSIONS AND DELAYS

(a) Except as provided in this paragraph, Contractor shall not be liable to Subcontractor for any delay to the Subcontractor's work regardless of who or what causes the delay.

(b) Contractor shall be liable to the Subcontractor for damages Subcontractor incurs as a result of any acts, or failures to act, by or chargeable to the Owner which delays or suspends the Subcontractor's work, but only to the extent the Owner is liable for such damages and actually pays Contractor for such damages.

(c) The Subcontractor expressly agrees that an extension of time shall constitute the Subcontractor's sole and exclusive remedy if the Subcontractor is delayed, interfered with, disrupted or hindered in its work by Contractor or by other subcontractors or persons chargeable to Contractor.

(d) The Subcontractor acknowledges and agrees that the Subcontractor's failure to give a written notice of delay as prescribed herein constitutes a waiver by the Subcontractor of any extension of time for delay, disruption, interference or hindrance, howsoever caused. The Subcontractor's written notice of delay must be given to Contractor within forty-eight (48) hours from the time of the beginning of the delay, interference, disruption or hindrance by certified mail and contain facts establishing that the delay in completion of the work arises from causes beyond the control and without the fault or negligence, in whole or in part, of the Subcontractor.

## 6. CHANGES

Contractor shall have the right, without notice to any surety and without invalidating this Subcontract, to require extra work to be done or to make changes in work required by the Subcontract and the plans and specifications under which it is performed by altering, adding to or deduction there from.  The amount of adjustment in the Subcontract price which is to result from the extra work, change or omission shall be determined as follows:

(i) In the manner, if any, provided in the Prime Contract: or
(ii) If the Prime Contract does not specify then as agreed between Contractor and Subcontractor; or
(iii) If the parties do not agree then in the manner provided in Paragraph 12 herein below.

Subcontractor shall perform any such extra work, change or omission only upon written authorization from Contractor and upon receiving such written authorization Subcontractor shall proceed with such work and/or change in accordance with Contractor's instructions to Subcontractor whether or not the price adjustment has yet been determined and agreed upon. No officer, employee or agent of Contractor is authorized to direct any extra or changed work by oral order. With respect to any price adjustment proposed by Subcontractor or for any such extra work, change or omission, Subcontractor shall supply Contractor with an itemized cost breakdown within seven (7) days after Contractor's request therefor. Any such additions, omissions or changes shall be deemed to be part of the work hereunder and shall be performed and furnished in strict accordance with this Subcontract.

**7. TERMINATION/SUSPENSION**
If Contractor suspends the construction work on account of Owner's failure to comply with Owner's Prime Contract with Contractor or for any other cause not the fault of Contractor, then Subcontractor shall immediately, upon written order from Contractor, discontinue work permanently or for such period of time as may be required by such cause and proceed again at such time as shall be ordered by Contractor. If such a suspension is permanent and the work of improvement is not to be completed by Contractor and Subcontractor is not in default under this Subcontract, Subcontractor shall receive payment for so much of said work as he performed or furnished, at such price as said work is worth in proportion to the total work done under this Subcontract, at this Subcontractor's price, and shall receive no further compensation or damages.

**8. INSURANCE/BONDS**
Subcontractor shall procure and maintain, at its own expense, until completion and final acceptance of the work, Comprehensive General Liability and Comprehensive Automobile Liability Insurance in the minimum amount of $1,000,000 for bodily injury, including death, to any one person and $1,000,000 for injuries, including death, to more than one person in any one occurrence, and $1,000,000 for damage to property in any one occurrence. Such insurance shall provide coverage for, but shall not be limited to, premises, operations, products and completed operations, owner's and contractor's protective, personal injury, blanket contractual, including liability assumed under this contract, broad form property damage, and for all owned, non-owned and hired automobiles used in connection with the work. Contractor, CSUB, State of California, Trustees of CSU, Officers, Employees, Reps and Agents shall also be named as an additional insured. Subcontractor shall maintain Workers Compensation, Waiver of Subrogation and Employers Liability Insurance in accordance with the laws of the State in which the work is situated or the Contract Documents. Before commencing the work, Subcontractor shall furnish certificates satisfactory to Contractor, from each insurance company, signed and endorsed by an authorized representative, showing that the insurance is in force, indicating policy numbers, dates of expiration, limits of liability hereunder, shall provide for at least thirty (30) days prior notification of cancellation and include completed operations. Subcontractor shall be responsible for all costs associated with implementation of all insurance and shall be responsible for all costs and payments associated with deductible amounts, claims, and/or reimbursements, for their work, regardless of type of incident (fire, theft, vandalism, other). Within five (5) days of a request by Contractor made at any time prior to the completion of the work and at Contractor's expense, Subcontractor shall furnish a performance and/or labor and materials payment bond from a surety and in a form satisfactory to Contractor which shall not cost Contractor more than one and two-tenths (1.2%) of the Subcontract price provided in Paragraph 2 hereinabove. Subcontractor shall require that any third party who contracts with Subcontractor to do any work involving this contract shall carry insurance in the amounts and of the types that this paragraph requires Subcontractor to carry.

**9. LABOR**
    (a) Employment of labor by Subcontractor shall be under conditions which are satisfactory to Contractor. Subcontractor shall use his best efforts to prevent the occurrence of any labor dispute, including, but not by way of limitation, any strike, slowdown, picketing or other labor difficulty, occurring at the jobsite by reason of the activities of Subcontractor, its employees, subcontractors, suppliers or material carriers. Subcontractor shall immediately inform Contractor of any facts which reasonably cause Subcontractor to expect the occurrence of any such labor dispute. If any such labor dispute occurs, Subcontractor shall keep Contractor informed of the progress of such labor dispute and shall cooperate fully with Contractor to resolve such labor dispute. If Subcontractor fails to prevent any such labor dispute, Contractor shall have the right, in addition to any other rights or remedies provided by this Subcontract or other contract documents or by law, after forty-eight (48) hours written notice mailed or delivered to the last known address of Subcontractor, to terminate this Agreement or any part thereof or the employment of Subcontractor for all or any portion of the work, and for the purpose of completing the work, to take possession of the premises and finish Subcontractor's work by whatever means it may deem expedient. In the event of such termination, the rights and obligations of Contractor and Subcontractor shall be determined the same as if this Subcontract were terminated under the provisions of Paragraph 7 hereinabove.
    (b) Pursuant to California Labor Code Section 1775, if a worker employed by Subcontractor on a public works project is not paid the general prevailing per diem wages by the subject Subcontractor, the prime contractor of the project is not liable for the penalties under subdivision (a) of Labor Code Section 1775 unless the prime contractor had knowledge of that failure of the Subcontractor to pay the specified prevailing rate of wages to those workers or unless the prime contractor fails to comply with all of the following requirements:
        (i) The contract executed between the contractor and the subcontractor for the performance of work on the public works project shall include a copy of the provisions of California Labor Code Sections 1771, 1775, 1776, 1777.5, 1813 and 1815.
        (ii) The contractor shall monitor the payment of the specified general prevailing rate of per diem wages by the Subcontractor to the employees, by periodic review of the certified payroll records of the subcontractor.
        (iii) Upon becoming aware of the failure of the Subcontractor to pay his or her workers the specified prevailing rate of wages, the Contractor shall diligently take corrective action to halt or rectify the failure, including, but not limited to, retaining sufficient funds due the Subcontractor for work performed on the public works project.
        (iv) Prior to making final payment to the Subcontractor for work performed on the public works project, the contractor shall obtain an affidavit signed under penalty of perjury from the Subcontractor that the Subcontractor has paid the specified general prevailing rate of per diem wages to his or her employees on the public works project and any amounts due pursuant to Section 1813.
    (c) The California Labor Code Sections referred to in Section 9(b)(i) above are attached to this Subcontract Agreement, as Attachment 1. Subcontractor shall initial his / her or its acknowledgement of review of the foregoing California Labor Code Sections at the bottom of each page of said attachments. Concurrent with the execution of this agreement, Subcontractor shall be responsible for reviewing the attached Sections, including any modification, Addendums, or other adjustments made by the State of California.

**10. GOVERNMENTAL REGULATIONS**
    (a) Subcontractor agrees that the prevention of accidents to workers engaged upon or in the vicinity of the jobsite is Subcontractor's responsibility. Subcontractor agrees to comply with all laws, ordinances, rules, regulations, codes, orders, notices and requirements concerning safety including all requirements of Contractor's standard safety program and any additional or special safety standards which may be established by Contractor during the progress of the work. Subcontractor agrees to pay for all fines or penalties levied against the subcontractor, contractor and owner for any and or all Cal or Fed/OSHA, OSHPOD, Air Quality Control Board, Public Works and/or any other Governmental regulatory agency, as a result of subcontractor noncompliance.
    (b) Subcontractor agrees that all work to be performed hereunder and all actions by or on behalf of Subcontractor in pursuance thereof shall comply with all federal, state, municipal and local laws, ordinances, rules, regulations, orders, codes, standards, notices and requirements, including, without being limited thereto, those relating to discrimination in employment, fair employment practices, or equal opportunity. Subcontractor shall take whatever action may be required by Contractor to comply with Contractor's affirmative action plan for equal employment opportunity as the same may be amended from time to time; the Subcontractor shall at any time upon demand furnish such proof as Contractor may require showing such compliance and the correction, at Subcontractor's sole cost and expense of any violations.

Subcontract Agreement & Job #47005 — California State University, Bakersfield

## 11. INDEMNITY

Subcontractor specifically obligates itself to Contractor in the following respect:

(a) Subcontractor shall protect, hold free and harmless, defend and indemnify Contractor (including its officers, agents and employees) for all liability, penalties, costs, losses, damages, expenses, causes of action, claims or judgments (including attorney's fees) resulting from property damage or personal injury or death arising out of Subcontractor's performance of this Subcontract. Subcontractor's foregoing obligations include any and all liabilities that may arise pursuant to the Workers Compensation Law of the State of California, or otherwise, and further including such judgments or settlements as may be described in California Labor Code Section 3864 which arise out of or are connected in any manner with or result from the aforesaid liability, injury, disability or death. Subcontractor's foregoing indemnity and save harmless agreement shall apply to any acts or omissions, willful misconduct or negligent conduct, whether active or passive, on the part of Contractor or Subcontractor (or their agents, subcontractors or employees), except that said agreement shall not be applicable to injury, death or damage to property arising from the sole negligence or the sole willful misconduct of Contractor, its officers, agents, servants, or independent contractors (other than Subcontractor) who are directly responsible to Contractor.

(b) Subcontractor shall at all times defend, indemnify and hold Contractor and Owner, and the properties of Contractor and Owner, including construction funds and the real property upon which the jobsite is located, free and harmless from any and all liability for claims, liens or stop notices for labor performed or materials or equipment used or furnished to be used in said work, including any costs or expenses for attorney's fees and all damages resulting to Owner or Contractor because of any such claim, lien or stop notice. Subcontractor shall within five (5) days after service on him of written notice thereof, cause the property of Contractor described in any such claim, claim of lien, stop notice or action to foreclose the same to be freed from the effect of such claim, claim of lien, stop notice or action to foreclose the same. If Subcontractor fails to do so, Contractor is authorized to use all the means he may deem appropriate to cause such property to be so freed of such claim, claim of lien, stop notice or to cause the action to foreclose the same to be dismissed. The cost of such action by Contractor, including any attorney's fees incurred by Contractor, shall be immediately due and payable to Contractor by Subcontractor.

(c) Subcontractor shall indemnify Contractor against, defend, and save Contractor harmless for any and all loss, injury, claims, proceedings, liability, damages, fines, penalties, costs and expenses (including legal fees and disbursements) caused, suffered or incurred on account of Subcontractor's failure to comply, directly or indirectly, with any of its responsibilities and obligations under this Subcontract.

## 12. DISPUTES

For purposes of this Subcontract, Contractor and Subcontractor agree as follows with respect to any disputes, as hereinafter defined:

(a) If any dispute arises between Contractor and Subcontractor and which also involves Owner, and if in order to resolve the dispute or establish the rights and duties as between Contractor and Owner, Contractor is required to pursue procedures established by law or established by the Prime Contract for resolution of disputes between Contractor and Owner, then Subcontractor shall follow and participate in such procedures for the purpose of resolving all the rights, obligations and liabilities of Owner, Contractor, and Subcontractor relating to such dispute. Any final decision under such procedures shall be binding upon Contractor and Subcontractor to the same extent it is binding upon Contractor and Owner. Subcontractor agrees to furnish all documents, statements, witnesses and other information required by Contractor for such purposes and to pay or reimburse Contractor for all expenses and costs incurred in connection therewith. It is expressly understood that Contractor shall never be liable to Subcontractor to any greater extent than the Owner is liable to Contractor. In the event any such dispute involves any one or more of Contractor's other subcontractors, Contractor and Subcontractor herein shall take such steps as are necessary to consolidate their respective claims with those of such other subcontractors in a single procedure under the provisions of this subparagraph (a), so that the rights and liabilities of all parties to such dispute may be finally resolved by such single procedure.

(b) If any dispute arises between Contractor and Subcontractor which does not involve Owner as provided in subparagraph (c) herein below, then, at the election of Contractor, such dispute shall be submitted to arbitration or by appropriate proceedings to a court of competent jurisdiction. Any such arbitration shall be conducted in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association in effect at the time the demand for arbitration is made by the Contractor. Should any party refuse or neglect to appear or participate in any such arbitration proceedings, the arbitrator is empowered to decide the controversy in accordance with such evidence as is presented. (The arbitrator is authorized to award to any party or parties such sums as he shall deem proper for the time, expense and trouble of arbitration, including attorneys fees.) Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. In the event any such dispute involves any one or more of Contractor's other subcontractors, Contractor and Subcontractor herein shall take such steps as are necessary to consolidate their respective claims with those of such other subcontractors in a single arbitration proceeding under the provisions of this subparagraph (b), so that the rights and liabilities of all parties to such dispute may be finally resolved by such single proceeding.

(c) For purposes of this Section, "dispute" is defined as any claim or disagreement arising out of or relating to the rights, duties, and/or obligations of the parties under this Subcontract involving Contractor and Subcontractor or involving Contractor, Subcontractor and Owner or their agents, employees, representatives or contractors, including, but not by way of limitation, any claim or disagreement that concerns or relates to any authorized or claimed extra, change or modification under this Subcontract.

(d) No dispute shall interfere with the progress of construction and the Subcontractor agrees to proceed with its work as directed, despite disputes it may have against Contractor, the Owner or other parties.

(e) It is the intent of the parties to this Subcontract that this Section shall be interpreted broadly to carry out its purpose of obtaining final resolution of disputes through a single procedure so as to avoid a multiplicity of actions and the risk of inconsistent decisions. However, this Paragraph 12 shall not be construed to inhibit or prevent the Contractor from exercising his right to terminate this Subcontract in accordance with Paragraph 13 below.

## 13. REMEDIES

If Subcontractor fails to comply with this Subcontract in any respect, including, but not by way of limitation, any act of bankruptcy or insolvency by Subcontractor, or any failure to perform his work properly or at a speed which would permit its completion within the time allotted, in accordance with the Contract Schedule including revisions, Contractor shall, without releasing or waiving its rights against Subcontractor's sureties, have the following remedies in addition to, and without prejudice to any other remedies it may have under this Subcontract, the Prime Contract or law:

(a) Contractor may terminate this Subcontract if notice specifying the particulars of such failure has been given to Subcontractor and such failure is not remedied by Subcontractor within forty-eight (48) hours after service of such notice. In such event, Contractor may complete the work or cause the work to be completed by others, and Subcontractor shall repay immediately all costs and damages sustained by Contractor on account of Subcontractor's failure. Contractor may, at Contractor's option, use or reject any and all materials and equipment at the jobsite or at the Subcontractor's plant.

(b) Contractor may, without terminating this Subcontract, furnish such labor and/or materials as is necessary to complete Subcontractor's work or to prevent or resolve labor disputes. In such event, Subcontractor shall immediately pay to Contractor all the costs thereof, including compensation and liability insurance.

(c) The Contractor's determination of default made in good faith shall be conclusive as to Contractor's right to proceed as provided herein.

(d) In the event this Subcontract is terminated as provided in this Paragraph 13, Subcontractor shall not be entitled to receive any further payment until said work is finished. If the unpaid balance of the Subcontract price shall exceed the expense of finishing the work, including compensation for additional managerial, legal or administrative services and all claims against Contractor in connection therewith, such excess shall be paid to Subcontractor. If such expenses and claims shall exceed such unpaid balance, the Subcontractor shall immediately pay the difference to Contractor.

## 14. CONTRACTOR'S RIGHT TO OFFSET

With respect to any damages, costs or expenses of any kind sustained by Contractor by reason of Subcontractors breach of this Subcontract and with respect to any costs, expenses or other amounts owing by Subcontractor to Contractor pursuant to this Subcontract, Contractor shall be entitled to deduct the same from any payments then or thereafter due or becoming due to Subcontractor under this Subcontract. If any damages, costs, expenses, claims or other amounts owing by Subcontractor pursuant to this Subcontract shall exceed the unpaid balance of the Subcontract price, Contractor shall be

entitled to offset such excess against any funds in Contractor's possession belonging to or claimed by Subcontractor or against any sums now or then due or becoming due Subcontractor from any source whatsoever.

**15. MISCELLANEOUS**

(a) This Subcontract takes precedence over any and all proposals, correspondence and agreements made prior to the date hereof. This Subcontract or the moneys becoming due under this Subcontract shall not be assigned in whole or in part, voluntarily or involuntarily, without the written permission of the Contractor. Any such assignment shall not release Subcontractor from his duty to Contractor to discharge his obligations and liabilities under this Subcontract and assignee shall take subject to all rights of Contractor provided in this Subcontract.

(b) Any and all notices, demands or other matters required or permitted by this Subcontract or by law to be served on or given to or delivered to either party by the other party to this Subcontract shall be in writing and shall be deemed duly served, given or delivered when personally delivered to the party to whom it is addressed (or to a supervisorial employee of such party), or in lieu of such personal service, when deposited in the United States mail, first class postage prepaid and addressed as provided in the introductory paragraph of this Subcontract.

(c) In the event either party hereto shall prevail in any action, arbitration, or other proceeding concerning this Subcontract, such party shall be entitled to receive from the other party all court costs, a reasonable sum as attorney's fees and all other expenses incurred therein and the preparation thereof.

(d) The waiver by Contractor of a breach of any term, covenant or condition contained in this Subcontract shall not be treated as a continuing waiver of such term, covenant, or condition or as a waiver of a future breach of the same or any other term, covenant or condition contained in this Subcontract. All rights and remedies under this Subcontract shall be cumulative and are in addition to, and not in derogation of, all other rights and remedies. All such rights and remedies may be exercised either successively or concurrently. If any term, provision, covenant or condition of this Subcontract is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

(e) The section headings and captions of the Subcontract are for reference only, and are not to be construed in any way as a part of this Subcontract.

**CONTRACTORS ARE REQUIRED TO BE LICENSED AND REGULATED BY THE CONTRACTORS' STATE LICENSE BOARD. ANY QUESTIONS CONCERNING A CONTRACTOR MAY BE REFERRED TO THE REGISTRAR OF THE BOARD WHOSE ADDRESS IS:**

**CONTRACTORS STATE LICENSE BOARD**
**1020 N STREET**
**SACRAMENTO, CALIFORNIA 95814**

IN WITNESS WHEREOF, the parties have executed this Subcontract in duplicate as of the day and year first above written.

SUBCONTRACTOR

Roy's Flooring

By: _Jose Roy Garcia_

Title: _Owner_

California State License Number: _637480_

Federal Identification Number: _51 - 0456188_

State EDD Number: _227 1327 5_

S. C. ANDERSON, INC.
CONTRACTOR

By: _Leigh Ru Peterson_

Title: _Chief Executive Officer_

California State License Number: _441769_

**NOTE: THIS CONTRACT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION.**

CSUB STUDENT RECREATION CENTER
Exhibit "A"  List of Contract Documents Dated March 7, 2007

## SHEET INDEX

**GENERAL**

A0.01      GENERAL NOTES, ABBREVIATIONS & LEGEND

**CIVIL / LANDSCAPE**

C0.0      DEMOLITION PLAN
C1.0      GRADING PLAN
C2.0      GRADING NOTES & DETAILS
C3.0      SITE UTILITY PLAN
C4.0      SITE UTILITY NOTES & DETAILS
C5.0      HORIZONTAL CONTROL PLAN

L1.1      PLANTING PLAN
L1.2      PLANTING LEGEND & DETAILS
L2.1      IRRIGATION PLAN
L2.2      IRRIGATION LEGEND
L2.3      IRRIGATION DETAILS
L2.4      IRRIGATION DETAILS
L3.1      PUMP SPECIFICATIONS
L3.2      GROUNDING SPECIFICATIONS

**ARCHITECTURAL**

A0.10      CODE ANALYSIS
A0.11      CODE ANALYSIS FLOOR PLANS
A0.12      FIRE RESISTIVE ASSEMBLIES REFERENCE SHEET
A1.10      OVERALL ARCHITECTURAL SITE PLAN
A1.20      ARCHITECTURAL SITE PLAN
A1.30      ARCHITECTURAL SITE DETAILS & ELEVATIONS
A1.31      ARCHITECTURAL SITE DETAILS
A2.10      OVERALL MAIN LEVEL FLOOR PLAN
A2.11      MAIN LEVEL FLOOR PLAN - WEST
A2.12      MAIN LEVEL FLOOR PLAN – EAST
A2.20      OVERALL UPPER LEVEL FLOOR PLAN
A2.21      UPPER LEVEL FLOOR PLAN - WEST
A2.22      UPPER LEVEL FLOOR PLAN – EAST
A2.30      OVERALL CLERESTORY PLAN
A2.31      CLERESTORY PLAN
A2.40      OVERALL ROOF PLAN
A2.41      ROOF PLAN - WEST
A2.42      ROOF PLAN - EAST
A2.70      GYMNASIUM PRECAST PANEL PLAN & ELEVATIONS
A3.10      OVERALL EXTERIOR ELEVATIONS
A3.11      EAST & WEST EXTERIOR ELEVATIONS
A3.12      NORTH EXTERIOR ELEVATION
A3.13      SOUTH EXTERIOR ELEVATION
A3.20      BUILDING SECTIONS
A3.21      BUILDING SECTIONS
A3.22      BUILDING SECTIONS
A3.30      WALL SECTIONS
A3.31      WALL SECTIONS
A3.32      WALL SECTIONS
A3.33      WALL SECTIONS
A3.34      WALL SECTIONS
A4.10      ENLARGED PLANS & INTERIOR ELEVATION
A4.11      ENLARGED PLANS & INTERIOR ELEVATION
A4.12      INTERIOR ELEVATIONS

CSUB STUDENT RECREATION CENTER
Exhibit "A"   List of Contract Documents Dated March 7, 2007

**ARCHITECTURAL (CONT.)**

| | |
|---|---|
| A4.13 | INTERIOR ELEVATIONS |
| A4.14 | INTERIOR ELEVATIONS |
| A4.15 | INTERIOR ELEVATIONS |
| A4.20 | ENLARGED PLANS & INTERIOR ELEVATIONS |
| A4.21 | INTERIOR ELEVATIONS |
| A5.50 | STANDARD MILLWORK DETAILS |
| A5.51 | MILLWORK PLANS, ELEVATIONS & DETAILS |
| A6.10 | OVERALL MAIN LEVEL RCP |
| A6.11 | MAIN LEVEL RCP - WEST |
| A6.12 | MAIN LEVEL RCP - EAST |
| A6.20 | OVERALL UPPER LEVEL RCP |
| A6.21 | UPPER LEVEL RCP - WEST |
| A6.22 | UPPER LEVEL RCP – EAST |
| A7.10 | STAIR PLANS & SECTIONS |
| A7.11 | ELEVATOR PLANS & SECTIONS |
| A7.20 | RUNNING TRACK / GYM STAIR GATE DETAILS |
| A7.21 | STAIR & GUARDRAIL DETAILS |
| A8.01 | PERGOLA PLANS & DETAILS |
| A8.10 | EXTERIOR WALL & ROOF DETAILS |
| A8.11 | EXTERIOR WALL & ROOF DETAILS |
| A9.00 | WALL TYPES - TYPICAL |
| A9.01 | INTERIOR DETAILS |
| A9.02 | INTERIOR DETAILS |
| A9.03 | TYPICAL CEILING DETAILS |
| A9.50 | FURNISHING & EQUIPMENT SCHEDULE |
| A9.60 | SIGNAGE SCHEDULE & DIAGRAMS |
| A9.70 | ROOM FINISH SCHEDULE |
| A9.71 | INTERIOR FINISH LEGEND |
| A9.72 | OVERALL MAIN LEVEL FINISH PLAN |
| A9.73 | OVERALL UPPER LEVEL FINISH PLAN |
| A9.80 | DOOR SCHEDULE & ELEVATIONS / FRAME ELEVATIONS |
| A9.81 | DOOR DETAILS |
| A9.90 | WINDOW ELEVATION & SCHEDULE |
| A9.91 | WINDOW DETAILS |
| A9.92 | WINDOW DETAILS |

**STRUCTURAL**

| | |
|---|---|
| S1.00 | GENERAL NOTES, DESIGN CRITERIA, ABBREVIATIONS, LEGEND, & SHEET INDEX |
| S2.10 | OVERALL MAIN LEVEL FOUNDATION PLAN |
| S2.11 | MAIN LEVEL FOUNDATION PLAN - WEST |
| S2.12 | MAIN LEVEL FOUNDATION PLAN - EAST |
| S2.20 | OVERALL UPPER LEVEL FRAMING PLAN |
| S2.21 | UPPER LEVEL FRAMING PLAN - WEST |
| S2.21A | UPPER LEVEL REINFORCING PLAN – WEST |
| S2.22 | UPPER LEVEL FRAMING PLAN – EAST |
| S2.22A | UPPER LEVEL REINFORCING PLAN - EAST |
| S2.30 | OVERALL ROOF FRAMING PLAN |
| S2.31 | ROOF FRAMING PLAN - WEST |
| S2.32 | ROOF FRAMING PLAN - EAST |
| S2.40 | HIGH ROOF FRAMING PLAN |
| S3.01 | TYPICAL CONCRETE DETAILS |
| S3.10 | FOUNDATION DETAILS |
| S3.20 | PRECAST SHEAR WALL ELEVATIONS |
| S5.00 | TYPICAL CONNECTION SCHEDULE AND DETAILS |
| S5.01 | TYPICAL STEEL DETAILS |

# CSUB STUDENT RECREATION CENTER
## Exhibit "A"   List of Contract Documents Dated March 7, 2007

**STRUCTURAL (CONT.)**

| | |
|---|---|
| S5.02 | TYPICAL STEEL DETAILS |
| S5.10 | STEEL DETAILS |
| S5.11 | STEEL DETAILS |
| S5.12 | STEEL DETAILS |
| S5.20 | STEEL BRACE ELEVATIONS |
| S5.21 | STEEL BRACE DETAILS |
| S5.30 | STEEL JOIST SPECIAL LOADS |

**MECHANICAL**

| | |
|---|---|
| MEP0.01 | MECHANICAL / ELECTRICAL / PLUMBING SCHEDULES |
| MEP0.02 | MECHANICAL / ELECTRICAL / PLUMBING SCHEDULE |
| M0.01 | MECHANICAL NOTES |
| M0.02 | MECHANICAL LEGEND |
| M2.11 | MAIN LEVEL MECHANICAL DUCTWORK PLAN WEST |
| M2.11P | MAIN LEVEL MECHANICAL PIPING PLAN WEST |
| M2.12 | MAIN LEVEL MECHANICAL FLOOR PLAN EAST |
| M2.12P | MAIN LEVEL MECHANICAL PIPING PLAN EAST |
| M2.21 | UPPER LEVEL MECHANICAL DUCTWORK PLAN WEST |
| M2.21P | UPPER LEVEL MECHANICAL PIPING PLAN WEST |
| M2.22 | UPPER LEVEL MECHANICAL DUCTWORK PLAN EAST |
| M2.40 | MECHANICAL ROOF PLAN |
| M3.10 | MECHANICAL ENLARGED PLANS |
| M4.10 | MECHANICAL FLOW SCHEMATICS |
| M5.10 | MECHANICAL CONTROLS DIAGRAM |
| M6.10 | MECHANICAL DETAILS |
| M6.11 | MECHANICAL DETAILS |
| M7.10 | TITLE 24 REQUIREMENTS - ENVELOPE |
| M7.11 | TITLE 24 REQUIREMENTS - ENVELOPE |
| M7.12 | TITLE 24 REQUIREMENTS - MECHANICAL |
| M7.13 | TITLE 24 REQUIREMENTS - MECHANICAL |

**PLUMBING**

| | |
|---|---|
| MEP0.01 | MECHANICAL / ELECTRICAL / PLUMBING SCHEDULES |
| MEP0.02 | MECHANICAL / ELECTRICAL / PLUMBING SCHEDULE |
| PFP0.01 | PLUMBING / FIRE PROTECTION NOTES AND LEGEND |
| P2.00 | MAIN LEVEL UNDERGROUIND PLUMBING PLANS |
| P2.10 | MAIN LEVEL PLUMBING PLAN |
| P2.20 | UPPER LEVEL PLUMING PLAN |
| P2.40 | ROOF PLUMBING PLAN |
| P3.00 | MAIN LEVEL UNDERGROUIND PLUMBING ENLARGED PLANS |
| P3.10 | MAIN LEVEL PLUMBING ENLARGED PLAN |
| P3.20 | UPPER LEVEL PLUMING ENLARGED PLAN |
| P4.10 | PLUMBING DIAGRAMS |
| P5.10 | PLUMBING ISOMETRICS |
| P6.10 | PLUMBING DETAILS |
| FP2.10 | MAIN LEVEL FIRE PROTECTION PLAN |
| FP2.20 | UPPER LEVEL FIRE PROTECTION PLAN |
| FP3.10 | FIRE PROTECTION ENLARGED PLAN & DETAILS |

CSUB STUDENT RECREATION CENTER
Exhibit "A"   List of Contract Documents Dated March 7, 2007

**ELECTRICAL**

| | |
|---|---|
| MEP0.01 | MECHANICAL / ELECTRICAL / PLUMBING SCHEDULES |
| MEP0.02 | MECHANICAL / ELECTRICAL / PLUMBING SCHEDULE |
| | |
| E0.01 | ELECTRICAL SYMBOLS LEGEND |
| E0.10 | ELECTRICAL SITE PLAN |
| E0.20 | ELECTRICAL PANEL SCHEDULES |
| E0.21 | ELECTRICAL PANEL SCHEDULES |
| E0.22 | ELECTRICAL PANEL SCHEDULES |
| E0.23 | TITLE 24 CALCULATIONS |
| E0.24 | TITLE 24 CALCULATIONS |
| E0.25 | TITLE 24 CALCULATIONS |
| E1.10 | ELECTRICAL ONE-LINE |
| E1.11 | LIGHTING CONTROL DETAILS AND FIXTURE SCHEDULE |
| E2.11 | MAIN LEVEL ELECTRICAL FLOOR PLAN - WEST |
| E2.12 | MAIN LEVEL ELECTRICAL FLOOR PLAN - EAST |
| E2.21 | UPPER LEVEL ELECTRICAL FLOOR PLAN - WEST |
| E2.22 | UPPER LEVEL ELECTRICAL FLOOR PLAN - EAST |
| E2.40 | ELECTRICAL ROOF PLAN |
| E2.50 | MAIN LEVEL ELECTRICAL ENLARGED PLAN |
| EL2.11 | MAIN LEVEL LIGHTING FLOOR PLAN - WEST |
| EL2.12 | MAIN LEVEL LIGHTING FLOOR PLAN - EAST |
| EL2.21 | UPPER LEVEL LIGHTING FLOOR PLAN - WEST |
| EL2.22 | UPPER LEVEL LIGHTING FLOOR PLAN – EAST |
| EL3.00 | FIELD LIGHTING |
| ET0.00 | TECHNOLOGY SYMBOL LEGEND |
| ET0.01 | TECHNOLOGY ONE-LINE DIAGRAM |
| ET1.00 | TECHNOLOGY SITE PLAN |
| ET2.11 | MAIN LEVEL TECHNOLOGY FLOOR PLAN - WEST |
| ET2.12 | MAIN LEVEL TECHNOLOGY FLOOR PLAN - EAST |
| ET2.21 | UPPER LEVEL TECHNOLOGY FLOOR PLAN - WEST |
| ET2.22 | UPPER LEVEL TECHNOLOGY FLOOR PLAN - EAST |
| ET3.10 | ENLARGED TECHNOLOGY ROOM PLAN |
| ET4.00 | TECHNOLOGY DETAILS |
| ET4.01 | TECHNOLOGY DETAILS |
| ET4.02 | TECHNOLOGY DETAILS |
| ET4.03 | TECHNOLOGY DETAILS |
| ET4.04 | TECHNOLOGY DETAILS |
| ET5.00 | TECHNOLOGY SCHEDULE |

**CALIFORNIA STATE UNIVERSITY BAKERSFIELD
STUDENT RECREATION CENTER**

**Bid Package 16A
Wood / Rubber / Sports Flooring**

All Contract Documents, Pre-Bid Information, Bid Documents, Construction Agreement, General and Supplemental Conditions, Project Schedule, Project Manuals, the requirements of all relevant specification sections, and addenda are hereby incorporated into this bid package by their reference.

Work shall be performed in accordance with the Construction Manager's Manual and CPM Schedule. The successful subcontractor must adhere to the completion and milestone dates pertaining to this Bid Package in the CPM schedule. Procurement of materials and/or equipment shall be completed in a timely manner to ensure compliance with the project schedule. Extensions of time will not be granted unless the circumstances of the delay(s) are as set for the in the General and Supplemental Conditions.

In addition to the above, work for this bid package shall include the furnishing of all labor, materials, processes, equipment, means and methods and related items required to complete the work as shown on the drawings and set forth in the specifications referred to herein or elsewhere in the Contact Documents

The Scope of the Work shall include, but not be limited to the following:

1. Furnish and install all work as defined in Specification Section 09644 – Resilient Wood Flooring Assemblies.
2. Furnish and install all work as defined in Specification Section 09625 – Synthetic Sports Flooring.
3. Floor prep as required to produce a surface suitable to install flooring as noted in specifications.
4. Test concrete slabs for moisture per manufactures recommendations.
5. Prepare concrete or other similar wall surfaces to allow proper installation of base material.
6. Floor material, base, reducer and edging as required to complete work in this bid package.
7. Provide substrate preparation, all vapor barriers, plywood, subfloor, wood strip flooring, resilient pads, isolator pads, fasteners, adhesives, cork expansion strips, wood trim, air channels, line painting, perimeter, ventilation base, sealer, finish coats for a complete system.
8. Provide ADA compliant non-skid aluminum threshold at wood floor/door and window transitions per Details 4, 5, 10/A9.81 and 3/A9.91.
9. Provide ADA compliant non-skid aluminum threshold transition strip per Detail 15/A9.81.
10. Provide layout for installed in this bid package.
11. Provide all rubber tile, sheet sport surfaces, reducer strips, adhesives, line painting, shock pads, mat sealer, wear coats, top coats, substrate preparation for a complete system.
12. Provide, at a minimum, weekly cleanup and off site removal of trash, debris and unused construction materials.

13. All work to be performed in a manner that meets all Federal, State, County, City, or Local codes and regulations.
14. Provide access as required to allow Inspectors, Owner, Architect, or Construction Manager to perform inspections.
15. Provide Owner with specified contract closeout documents, including "As Built Drawings", at the conclusion of contract.
16. Inspection and repair of all defective work for a period of one year from the date the work is accepted by the Engineer, or if subsequent repairs are required, one year from the date the repairs are complete.
17. Provide protection of contiguous work to prevent damage when performing work under this contract. Repair of any work damaged under this contract will be performed by this contractor with no additional cost to the Owner.
18. Locate and protect work in place including al existing (underground and above ground) utilities.
19. Provide protection for public and worker safety (barricades, harness, shoring, etc...) as required to meet applicable Federal, State, City or Local codes.
20. Provide security and proper storage for all construction materials related to this bid package.
21. Coordination of work with governmental agency engineers, inspectors and testing laboratory technicians, other contractors, construction manager and inspector of record, private property owners, and other contractors.
22. Coordinate testing with the Construction Manager and Inspection of Record.
23. Provide testing, inspections and certification as required by this bid package including inspections required by the City and/or County.
24. Costs for retesting of areas that failed previously are the responsibility of the Contractor (The Owner will pay cost for the first test).

Scope of work specifically excludes:
1. Plan check fees.
2. Tile flooring work.
3. Climbing wall system mat.
4. Resilient Flooring

It is the responsibility of each bidder to inspect the project site and review all relevant contract documents prior to submitting a bid.

Each bid submitted must include the following items at the time of bid:
1. Bid Form filled out completely.
2. Substitution Listing.
3. **Bids for this Bid Package will be received on the campus of CSU Bakersfield, 9001 Stockdale Highway, Bakersfield, CA 93311 at the Cafeteria Building (Stockdale Room) up to but no later than 2:00 p.m. on April 10, 2007.**
4. Any bid delivered via third party delivery service (i.e. Federal Express, UPS, etc...) must be inside a separate envelope contained within the delivery envelope. This step is necessary to preserve the privacy of the bidder's bid until the prescribed bid opening time.

Contact the Construction Manager if you need copies of any of the above forms.

# S.C. ANDERSON, INC. ATTACHMENT #1 TO SUBCONTRACT AGREEMENT [PUBLIC WORKS PROJECT]

1771.  Except for public works projects of one thousand dollars ($1,000) or less, not less than the general prevailing rate of per diem wages for work of a similar character in the locality in which the public work is performed, and not less than the general prevailing rate of per diem wages for holiday and overtime work fixed as provided in this chapter, shall be paid to all workers employed on public works.

This section is applicable only to work performed under contract, and is not applicable to work carried out by a public agency with its own forces. This section is applicable to contracts let for maintenance work.

1775.  (a) (1) The contractor and any subcontractor under the contractor shall, as a penalty to the state or political subdivision on whose behalf the contract is made or awarded, forfeit not more than fifty dollars ($50) for each calendar day, or portion thereof, for each worker paid less than the prevailing wage rates as determined by the director for the work or craft in which the worker is employed for any public work done under the contract by the contractor or, except as provided in subdivision (b), by any subcontractor under the contractor.

(2)  (A) The amount of the penalty shall be determined by the Labor Commissioner based on consideration of both of the following:

(i) Whether the failure of the contractor or subcontractor to pay the correct rate of per diem wages was a good faith mistake and, if so, the error was promptly and voluntarily corrected when brought to the attention of the contractor or subcontractor.

(ii) Whether the contractor or subcontractor has a prior record of failing to meet its prevailing wage obligations.

(B)  (i) The penalty may not be less than ten dollars ($10) for each calendar day, or portion thereof, for each worker paid less than the prevailing wage rate, unless the failure of the contractor or subcontractor to pay the correct rate of per diem wages was a good faith mistake and, if so, the error was promptly and voluntarily corrected when brought to the attention of the contractor or subcontractor.

(ii) The penalty may not be less than twenty dollars ($20) for each calendar day, or portion thereof, for each worker paid less than the prevailing wage rate, if the contractor or subcontractor has been assessed penalties within the previous three years for failing to meet its prevailing wage obligations on a separate contract, unless those penalties were subsequently withdrawn or overturned.

(iii) The penalty may not be less than thirty dollars ($30) for each calendar day, or portion thereof, for each worker paid less than the prevailing wage rate, if the Labor Commissioner determines that the violation was willful, as defined in subdivision (c) of Section 1777.1.

(C)  When the amount due under this section is collected from the contractor or subcontractor, any outstanding wage claim under Chapter 1 (commencing with Section 1720) of Part 7 of Division 2 against that contractor or subcontractor shall be satisfied before applying that amount to the penalty imposed on that contractor or subcontractor pursuant to this section.

(D)  The determination of the Labor Commissioner as to the amount of the penalty shall be reviewable only for abuse of discretion.

# S.C. ANDERSON, INC. ATTACHMENT #1 TO SUBCONTRACT AGREEMENT [PUBLIC WORKS PROJECT]

(E) The difference between the prevailing wage rates and the amount paid to each worker for each calendar day or portion thereof for which each worker was paid less than the prevailing wage rate shall be paid to each worker by the contractor or subcontractor, and the body awarding the contract shall cause to be inserted in the contract a stipulation that this section will be complied with.

(b) If a worker employed by a subcontractor on a public works project is not paid the general prevailing rate of per diem wages by the subcontractor, the prime contractor of the project is not liable for any penalties under subdivision (a) unless the prime contractor had knowledge of that failure of the subcontractor to pay the specified prevailing rate of wages to those workers or unless the prime contractor fails to comply with all of the following requirements:

(1) The contract executed between the contractor and the subcontractor for the performance of work on the public works project shall include a copy of the provisions of Sections 1771, 1775, 1776, 1777.5, 1813, and 1815.

(2) The contractor shall monitor the payment of the specified general prevailing rate of per diem wages by the subcontractor to the employees, by periodic review of the certified payroll records of the subcontractor.

(3) Upon becoming aware of the failure of the subcontractor to pay his or her workers the specified prevailing rate of wages, the contractor shall diligently take corrective action to halt or rectify the failure, including, but not limited to, retaining sufficient funds due the subcontractor for work performed on the public works project.

(4) Prior to making final payment to the subcontractor for work performed on the public works project, the contractor shall obtain an affidavit signed under penalty of perjury from the subcontractor that the subcontractor has paid the specified general prevailing rate of per diem wages to his or her employees on the public works project and any amounts due pursuant to Section 1813.

(c) The Division of Labor Standards Enforcement shall notify the contractor on a public works project within 15 days of the receipt by the Division of Labor Standards Enforcement of a complaint of the failure of a subcontractor on that public works project to pay workers the general prevailing rate of per diem wages.

1776.   (a) Each contractor and subcontractor shall keep accurate payroll records, showing the name, address, social security number, work classification, straight time and overtime hours worked each day and week, and the actual per diem wages paid to each journeyman, apprentice, worker, or other employee employed by him or her in connection with the public work.  Each payroll record shall contain or be verified by a written declaration that it is made under penalty of perjury, stating both of the following:

(1) The information contained in the payroll record is true and correct.

(2) The employer has complied with the requirements of Sections 1771, 1811, and 1815 for any work performed by his or her employees on the public works project.

(b) The payroll records enumerated under subdivision (a) shall be certified and shall be available for inspection at all reasonable hours at the principal office of the contractor on the following basis:

S.C. ANDERSON, INC.   ATTACHMENT #1 TO SUBCONTRACT AGREEMENT
[PUBLIC WORKS PROJECT]

(1) A certified copy of an employee's payroll record shall be made available for inspection or furnished to the employee or his or her authorized representative on request.

(2) A certified copy of all payroll records enumerated in subdivision (a) shall be made available for inspection or furnished upon request to a representative of the body awarding the contract, the Division of Labor Standards Enforcement, and the Division of Apprenticeship Standards of the Department of Industrial Relations.

(3) A certified copy of all payroll records enumerated in subdivision (a) shall be made available upon request by the public for inspection or for copies thereof. However, a request by the public shall be made through either the body awarding the contract, the Division of Apprenticeship Standards, or the Division of Labor Standards Enforcement. If the requested payroll records have not been provided pursuant to paragraph (2), the requesting party shall, prior to being provided the records, reimburse the costs of preparation by the contractor, subcontractors, and the entity through which the request was made. The public may not be given access to the records at the principal office of the contractor.

(c) The certified payroll records shall be on forms provided by the Division of Labor Standards Enforcement or shall contain the same information as the forms provided by the division.

(d) A contractor or subcontractor shall file a certified copy of the records enumerated in subdivision (a) with the entity that requested the records within 10 days after receipt of a written request.

(e) Any copy of records made available for inspection as copies and furnished upon request to the public or any public agency by the awarding body, the Division of Apprenticeship Standards, or the Division of Labor Standards Enforcement shall be marked or obliterated to prevent disclosure of an individual's name, address, and social security number. The name and address of the contractor awarded the contract or the subcontractor performing the contract shall not be marked or obliterated. Any copy of records made available for inspection by, or furnished to, a joint labor-management committee established pursuant to the federal Labor Management Cooperation Act of 1978 (29 U.S.C. Sec.   175a) shall be marked or obliterated only to prevent disclosure of an individual's name and social security number. A joint labor management committee may maintain an action in a court of competent jurisdiction against an employer who fails to comply with Section 1774. The court may award restitution to an employee for unpaid wages and may award the joint labor management committee reasonable attorney's fees and costs incurred in maintaining the action. An action under this subdivision may not be based on the employer's misclassification of the craft of a worker on its certified payroll records. Nothing in this subdivision limits any other available remedies for a violation of this chapter.

(f) The contractor shall inform the body awarding the contract of the location of the records enumerated under subdivision (a), including the street address, city, and county, and shall, within five working days, provide a notice of a change of location and address.

(g) The contractor or subcontractor has 10 days in which to comply subsequent to receipt of a written notice requesting the records enumerated in subdivision

S.C. ANDERSON, INC.  ATTACHMENT #1 TO SUBCONTRACT AGREEMENT
[PUBLIC WORKS PROJECT]

(a).  In the event that the contractor or subcontractor fails to comply within the 10-day period, he or she shall, as a penalty to the state or political subdivision on whose behalf the contract is made or awarded, forfeit twenty-five dollars ($25) for each calendar day, or portion thereof, for each worker, until strict compliance is effectuated.  Upon the request of the Division of Apprenticeship Standards or the Division of Labor Standards Enforcement, these penalties shall be withheld from progress payments then due.  A contractor is not subject to a penalty assessment pursuant to this section due to the failure of a subcontractor to comply with this section.

(h) The body awarding the contract shall cause to be inserted in the contract  stipulations to effectuate this section.

(i) The director shall adopt rules consistent with the California Public Records Act (Chapter 3.5 (commencing with Section 6250) of Division 7 of Title 1 of the Government Code) and the Information Practices Act of 1977 (Title 1.8 (commencing with Section 1798) of Part 4 of Division 3 of the Civil Code) governing the release of these records, including the establishment of reasonable fees to be charged for reproducing copies of records required by this section.

1777.5.  (a) Nothing in this chapter shall prevent the employment of properly registered apprentices upon public works.

(b) Every apprentice employed upon public works shall be paid the prevailing rate of per diem wages for apprentices in the trade to which he or she is registered and shall be employed only at the work of the craft or trade to which he or she is registered.

(c) Only apprentices, as defined in Section 3077, who are in training under apprenticeship standards that have been approved by the Chief of the Division of Apprenticeship Standards and who are parties to written apprentice agreements under Chapter 4 (commencing with Section 3070) of Division 3 are eligible to be employed at the apprentice wage rate on public works.  The employment and training of each apprentice shall be in accordance with either of the following:

(1) The apprenticeship standards and apprentice agreements under which he or she is training.

(2) The rules and regulations of the California Apprenticeship Council.

(d) When the contractor to whom the contract is awarded by the state or any political subdivision, in performing any of the work under the contract, employs workers in any apprenticeable craft or trade, the contractor shall employ apprentices in at least the ratio set forth in this section and may apply to any apprenticeship program in the craft or trade that can provide apprentices to the site of the public work for a certificate approving the contractor under the apprenticeship standards for the employment and training of apprentices in the area or industry affected.

However, the decision of the apprenticeship program to approve or deny a certificate shall be subject to review by the Administrator of Apprenticeship.  The apprenticeship program or programs, upon approving the contractor, shall arrange for the dispatch of apprentices to the contractor.  A contractor covered by an apprenticeship program's standards shall not be required to submit any additional application in order to include additional public works contracts under that program.

**S.C. ANDERSON, INC.   ATTACHMENT #1 TO SUBCONTRACT AGREEMENT [PUBLIC WORKS PROJECT]**

"Apprenticeable craft or trade," as used in this section, means a craft or trade determined as an apprenticeable occupation in accordance with rules and regulations prescribed by the California Apprenticeship Council.  As used in this section, "contractor" includes any subcontractor under a contractor who performs any public works not excluded by subdivision (o).

(e) Prior to commencing work on a contract for public works, every contractor shall submit contract award information to an applicable apprenticeship program that can supply apprentices to the site of the public work.  The information submitted shall include an estimate of journeyman hours to be performed under the contract, the number of apprentices proposed to be employed, and the approximate dates the apprentices would be employed.  A copy of this information shall also be submitted to the awarding body if requested by the awarding body.

  Within 60 days after concluding work on the contract, each contractor and subcontractor shall submit to the awarding body, if requested, and to the apprenticeship program a verified statement of the journeyman and apprentice hours performed on the contract.  The information under this subdivision shall be public.  The apprenticeship programs shall retain this information for 12 months.

(f) The apprenticeship program that can supply apprentices to the area of the site of the public work shall ensure equal employment and affirmative action in apprenticeship for women and minorities.

(g) The ratio of work performed by apprentices to journeymen employed in a particular craft or trade on the public work may be no higher than the ratio stipulated in the apprenticeship standards under which the apprenticeship program operates where the contractor agrees to be bound by those standards, but, except as otherwise provided in this section, in no case shall the ratio be less than one hour of apprentice work for every five hours of journeyman work.

(h) This ratio of apprentice work to journeyman work shall apply during any day or portion of a day when any journeyman is employed at the jobsite and shall be computed on the basis of the hours worked during the day by journeymen so employed.  Any work performed by a journeyman in excess of eight hours per day or 40 hours per week shall not be used to calculate the ratio. The contractor shall employ apprentices for the number of hours computed as above before the end of the contract or, in the case of a subcontractor, before the end of the subcontract.  However, the contractor shall endeavor, to the greatest extent possible, to employ apprentices during the same time period that the journeymen in the same craft or trade are employed at the jobsite.  Where an hourly apprenticeship ratio is not feasible for a particular craft or trade, the Chief of the Division of Apprenticeship Standards, upon application of an apprenticeship program, may order a minimum ratio of not less than one apprentice for each five journeymen in a craft or trade classification.

(i) A contractor covered by this section that has agreed to be covered by an apprenticeship program's standards upon the issuance of the approval certificate, or that has been previously approved for an apprenticeship program in the craft or trade, shall employ the number of apprentices or the ratio of apprentices to journeymen stipulated in the applicable apprenticeship standards, but in no event less than the 1-to-5 ratio required by subdivision (g).

**S.C. ANDERSON, INC.  ATTACHMENT #1 TO SUBCONTRACT AGREEMENT
[PUBLIC WORKS PROJECT]**

(B) If there are two or more approved multiemployer apprenticeship programs serving the same craft or trade and geographic area for which the training contributions were made to the council, the grant shall be divided among those programs based on the number of apprentices registered in each program.

(C) All training contributions not distributed under subparagraphs (A) and (B) shall be used to defray the future expenses of the Division of Apprenticeship Standards.

(3) All training contributions received pursuant to this subdivision shall be deposited in the Apprenticeship Training Contribution Fund, which is hereby created in the State Treasury. Notwithstanding Section 13340 of the Government Code, all money in the Apprenticeship Training Contribution Fund is hereby continuously appropriated for the purpose of carrying out this subdivision and to pay the expenses of the Division of Apprenticeship Standards.

(n) The body awarding the contract shall cause to be inserted in the contract stipulations to effectuate this section.  The stipulations shall fix the responsibility of compliance with this section for all apprenticeable occupations with the prime contractor.

(o) This section does not apply to contracts of general contractors or to contracts of specialty contractors not bidding for work through a general or prime contractor when the contracts of general contractors or those specialty contractors involve less than thirty thousand dollars ($30,000).

(p) All decisions of an apprenticeship program under this section are subject to Section 3081.

1813.  The contractor or subcontractor shall, as a penalty to the state or political subdivision on whose behalf the contract is made or awarded, forfeit twenty-five dollars ($25) for each worker employed in the execution of the contract by the respective contractor or subcontractor for each calendar day during which the worker is required or permitted to work more than 8 hours in any one calendar day and 40 hours in any one calendar week in violation of the provisions of this article.  In awarding any contract for public work, the awarding body shall cause to be inserted in the contract a stipulation to this effect.  The awarding body shall take cognizance of all violations of this article committed in the course of the execution of the contract, and shall report them to the Division of Labor Standards Enforcement.

1815.  Notwithstanding the provisions of Sections 1810 to 1814, inclusive, of this code, and notwithstanding any stipulation inserted in any contract pursuant to the requirements of said sections, work performed by employees of contractors in excess of 8 hours per day, and 40 hours during any one week, shall be permitted upon public work upon compensation for all hours worked in excess of 8 hours per day at not less than 11/2 times the basic rate of pay.

 **S. C. ANDERSON INC.**

## SUBCONTRACT/PURCHASE ORDER ADJUSTMENT

Project Name    CSUB Student Recreation Center

Project #    17005

Subcontractor/Vendor

Roy's Flooring

10781 Telfair Avenue

Pacoima, CA 91331

Date    December 19, 2007

Subcontract/P.O. Adjustment #    1

Change Order #    7

I.C.A. #    N/A

Terms

Per original Subcontract Agreement

Pursuant to the following modification(s) to the scope of work and/or materials provided as described in our

[X] Subcontract Agreement dated    06/18/07    [ ] Purchase Order #    dated

between S.C. ANDERSON, INC. and Subcontractor/Vendor, the price is [X] increased [ ] decreased by the sum of

Seventy Two Thousand Two Hundred Thirty Two Dollars and 00/100    $    72,232.00   , all taxes included.

| DESCRIPTION | COST CODE | AMOUNT |
|---|---|---|
| Provide all labor, material and equipment necessary to furnish and install synthetic flooring MP Sports (4 mm) per Bulletin #006-A dated 11/05/07. | 09925 | $72,232.00 |
| | | |
| | | |
| | | |

All other terms and conditions under said Subcontract Agreement or Purchase Order except as expressly modified herein remain in full force and effect.

IN WITNESS WHEREOF, the parties have executed this Subcontract/Purchase Order Adjustment on

_____ , 2007

Roy's Flooring
SUBCONTRACTOR OR VENDOR

By: _____ JOSE ROY GARCIA

CALIFORNIA STATE LICENSE NO. 637480

S.C. ANDERSON, INC.

By: _____

CALIFORNIA STATE LICENSE NO.    441769



# S. C. ANDERSON INC.

P.O. Box 81747 • Bakersfield, CA  93380-1747 • (661) 392-7000 • Fax (661) 391-9999
2160 Mars Court • Bakersfield, CA  93308

## SUBCONTRACT/PURCHASE ORDER ADJUSTMENT

| | |
|---|---|
| Project Name | CSUB Student Recreation Center |
| Project # | 17005 |
| Subcontractor/Vendor | |
| Roy's Flooring | |
| 10781 Telfair Avenue | |
| Pacoima, CA  91331 | |

| | |
|---|---|
| Date | June 11, 2008 |
| Subcontract/P.O. Adjustment # | 2 |
| Change Order # | 14 |
| I.C.A. # | N/A |
| Terms | |
| Per original Subcontract Agreement | |

Pursuant to the following modification(s) to the scope of work and/or materials provided as described in our

[x] Subcontract Agreement dated    06/18/07        [ ] Purchase Order # _____ dated _____

between S.C. ANDERSON, INC. and Subcontractor/Vendor, the price is  [x] increased    [ ] decreased by the sum of

Zero Dollars and 00/100                    $        0.00        , all taxes included.

| DESCRIPTION | COST CODE | AMOUNT |
|---|---|---|
| Provide all labor, materials, and equipment necessary to provide stripping for 3 (ea) badminton courts in gymnasium per Bulletin No. 033 dated 4/14/08. **NO COST IMPACT** | 09650 | $0.00 |
| Material cost increase to use 3/4" competition pads in lieu of 3/8" specified pads for resilient wood flooring in room #131 (gym) per Bulletin No. 034 dated 4/14/08. **NO COST IMPACT** | 09650 | $0.00 |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

All other terms and conditions under said Subcontract Agreement or Purchase Order except as expressly modified herein remain in full force and effect.

IN WITNESS WHEREOF, the parties have executed this Subcontract/Purchase Order Adjustment on          6-19          , 2008

Roy's Flooring
SUBCONTRACTOR OR VENDOR                    S.C. ANDERSON, INC

By:                                        By:

CALIFORNIA STATE LICENSE NO.    637480      CALIFORNIA STATE LICENSE NO.    441769



# S. C. ANDERSON INC.

P.O. Box 81747 • Bakersfield, CA  93380-1747 • (661) 392-7000 • Fax (661) 391-9999
2160 Mars Court • Bakersfield, CA  93308

## SUBCONTRACT/PURCHASE ORDER ADJUSTMENT

Project Name     CSUB Student Recreation Center

Project #     17005

Subcontractor/Vendor

Roy's Flooring

10781 Telfair Avenue

Pacoima, CA  91331

Date     March 23, 2009

Subcontract/P.O. Adjustment #     3

Change Order #     N/A

I.C.A. #     221

Terms

Per original Subcontract Agreement

Pursuant to the following modification(s) to the scope of work and/or materials provided as described in our

[X] Subcontract Agreement dated     06/18/07     [ ] Purchase Order #     dated

between S.C. ANDERSON, INC. and Subcontractor/Vendor, the price is   [ ] increased   [X] decreased by the sum of

Five Hundred Seventy Seven Dollars and 05/100     $     (577.05)     , all taxes included.

| DESCRIPTION | COST CODE | AMOUNT |
|---|---|---|
| Backcharge for use of forklift on 1/26/09 and 1/27/09. | 09650 | ($577.05) |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

All other terms and conditions under said Subcontract Agreement or Purchase Order except as expressly modified herein remain in full force and effect.

IN WITNESS WHEREOF, the parties have executed this Subcontract/Purchase Order Adjustment on     , 2009

Roy's Flooring
SUBCONTRACTOR OR VENDOR

By:

CALIFORNIA STATE LICENSE NO.     637480

S.C. ANDERSON, INC.

By:

CALIFORNIA STATE LICENSE NO.     441769



# S.C. ANDERSON INC.

P.O. Box 81747 • Bakersfield, CA 93380-1747 • (661) 392-7000 • Fax (661) 391-9999
2160 Mars Court • Bakersfield, CA 93308

RECEIVED JUL 2009 ANDERSON

## SUBCONTRACT/PURCHASE ORDER ADJUSTMENT

| | |
|---|---|
| Project Name | CSUB Student Recreation Center |
| Project # | 17005 |
| Subcontractor/Vendor | |
| Roy's Flooring | |
| 10781 Telfair Avenue | |
| Pacoima, CA 91331 | |

| | |
|---|---|
| Date | June 8, 2009 |
| Subcontract/P.O. Adjustment # | 4 |
| Change Order # | N/A |
| I.C.A. # | 207 |
| Terms | |
| | Per original Subcontract Agreement |

Pursuant to the following modification(s) to the scope of work and/or materials provided as described in our

[x] Subcontract Agreement dated    06/18/07         [ ] Purchase Order #                    dated

between S.C. ANDERSON, INC. and Subcontractor/Vendor, the price is  [x] increased   [ ] decreased by the sum of

Four Hundred Forty One Dollars and 36/100        $        441.36        , all taxes included.

| DESCRIPTION | COST CODE | AMOUNT |
|---|---|---|
| Provide all labor, material and equipment necessary to apply Visionmatte to tiles that were damaged by others in weight rooms. | 09650 | $441.36 |
| | | |

All other terms and conditions under said Subcontract Agreement or Purchase Order except as expressly modified herein remain in full force and effect.

IN WITNESS WHEREOF, the parties have executed this Subcontract/Purchase Order Adjustment on    6-8-2009    , 2009

Roy's Flooring
SUBCONTRACTOR OR VENDOR

By:

CALIFORNIA STATE LICENSE NO.    637480

S.C. ANDERSON, INC.

By:

CALIFORNIA STATE LICENSE NO.

441769



# S.C. ANDERSON INC.

P.O. Box 81747 • Bakersfield, CA 93380-1747 • (661) 392-7000 • Fax (661) 391-9999
2160 Mars Court • Bakersfield, CA 93308 .

RECEIVED

## SUBCONTRACT/PURCHASE ORDER ADJUSTMENT

AUG 0 6 2009

ANDERSON

| | |
|---|---|
| Project Name | CSUB Student Recreation Center |
| Project # | 17005 |
| Subcontractor/Vendor | |
| Roy's Flooring | |
| 10781 Telfair Avenue | |
| Pacoima, CA 91331 | |

| | |
|---|---|
| Date | July 15, 2009 |
| Subcontract/P.O. Adjustment # | 5 |
| Change Order # | 20 |
| I.C.A. # | N/A |
| Terms | |
| | Per original Subcontract Agreement |

Pursuant to the following modification(s) to the scope of work and/or materials provided as described in our

[X] Subcontract Agreement dated _____06/18/07_____  [ ] Purchase Order # _____ dated _____

between S.C. ANDERSON, INC. and Subcontractor/Vendor, the price is [X] increased [ ] decreased by the sum of

__Seventy Two Thousand One Hundred Nineteen Dollars and 91/100__ $ ____72,119.91____ , all taxes included.

| DESCRIPTION | COST CODE | AMOUNT |
|---|---|---|
| Provide all labor, material and equipment necessary to install moisture sealer in fitness room. | 09650 | $43,327.91 |
| Provide all labor, material and equipment necessary to install moisture sealer at running track. | 09650 | $28,792.00 |
| | | |
| | | |
| | | |
| | | |
| | | |
| *Total Subcontract Adjustment* | 09650 | $72,119.91 |
| | | |

All other terms and conditions under said Subcontract Agreement or Purchase Order except as expressly modified herein remain in full force and effect.

IN WITNESS WHEREOF, the parties have executed this Subcontract/Purchase Order Adjustment on _____ , 2009

Roy's Flooring
SUBCONTRACTOR OR VENDOR

By: _____

S.C. ANDERSON, INC.

By: *Leigh Ri Keller*

CALIFORNIA STATE LICENSE NO. ___637480___

CALIFORNIA STATE LICENSE NO. ____441769____

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF KERN

JAN 08 2018

TERRY McNALLY, CLERK
BY _____, DEPUTY

1  Ray T. Mullen, Esq., CSB #111852
2  **LAW OFFICE OF RAY T. MULLEN**
   1405 Commercial Way, Suite 130
3  Bakersfield, California 93309
   Tel:       (661) 631-1531
4  Fax:       (661) 631-2427
   E-Mail:    Ray@Raymullen.com
5
6  Attorneys for Plaintiff: S.C. Anderson, Inc.

7              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

8  **COUNTY OF KERN, METROPOLITAN DISTRICT, CIVIL DIVISION [UNLIMITED]**

| | |
|---|---|
| S.C. ANDERSON, INC., a California corporation, | CASE NO.: BCV-17-102683-TSC |
| Plaintiff, | **AMENDMENT TO COMPLAINT FOR:** |
| vs. | 1. Breach of Written Subcontract Agreement |
| | 2. Negligence |
| JOSE ROY GARCIA, an Individual formerly doing business as ROY'S FLOORING, also known as ROY'S FLOORING, INC., a California corporation; NORTH AMERICAN SPECIALTY FLOORING, INC., a foreign corporation, formerly doing business as SPORTS SURFACES, a business entity of unknown form but also known as SPORTS SURFACES TRACTION USA; and KOSTER AMERICAN CORPORATION doing business as KOSTER USA, a foreign corporation Licensed and registered to do business in California; and DOES 1 through 50; inclusive, | 3. Breach of Express Warranties |
| | 4. Breach of Implied Warranties |
| | 5. Strict Liability |
| Defendants. | |

22    **COMES NOW**, Plaintiff S.C. Anderson, Inc., (hereinafter referred to as

23  "Plaintiff"), by and through its attorney of record, and does hereby Amend its Complaint

24  filed in this action as follows:

25

AMENDMENT TO COMPLAINT FOR BREACH OF WRITTEN SUBCONTRACT AGREEMENT;
NEGLIGENCE; BREACH OF EXPRESS WARRANTIES; BREACH OF IMPLIED WARRANTIES; AND
STRICT LIABILITY - 1

1.     In the caption of the Complaint on page one, line 15, Defendant, "NORTH AMERICAN SPECIALTY FLOORING, INC." was erroneously misspelled as "NORTH AMERICAN SPCIALTY FLOORING, INC."; by this Amendment, said caption shall be amended to comport with the correct spelling as found in the Complaint at Page 2, Line 12, and shall hereinafter be denoted and read as "NORTH AMERICAN SPECIALTY FLOORING, INC."

Dated: 1/5/2018

**LAW OFFICE OF RAY T. MULLEN**

By: _____

Ray T. Mullen, Attorney for Plaintiff:
S.C. Anderson, Inc.

**IT IS SO ORDERED.**

Dated: JAN 0 8 2018     By: _____

**THOMAS S. CLARK**

JUDGE OF THE KERN COUNTY SUPERIOR COURT

AMENDMENT TO COMPLAINT FOR BREACH OF WRITTEN SUBCONTRACT AGREEMENT; NEGLIGENCE; BREACH OF EXPRESS WARRANTIES; BREACH OF IMPLIED WARRANTIES; AND STRICT LIABILITY - 2